### LATIMER et al. v. VEADER.

(Supreme Court, Appellate Division, First Department. August 4, 1897.)

1. BANKS—APPROPRIATION OF MONEY BY EMPLOYES—LIABILITY OF OFFICERS.
    A paying teller is liable to the bank for money stolen from it by co-employes who are his subordinates, with his knowledge and connivance.

2. MORTGAGE—DEBTS SECURED.
    A defalcation having been discovered by the officers of a bank, the secretary confessed that he had appropriated a part of the missing money, which he claimed to have restored; stated his willingness to make good anything for which he was directly or indirectly responsible; and executed a mortgage to secure a written agreement that if, after further investigation, there should be found to exist any "indebtedness" from him to the bank, he would pay the same. *Held*, that the security covered the mortgagor's liability to the bank for money stolen by employes through his connivance or culpable negligence.

Appeal from special term, New York county.

Action by G. Byron Latimer and the Irving Savings Institution against William H. Buxton and others to foreclose a mortgage. From a judgment for plaintiffs, defendant Buxton, who alone appeared, appealed; and, having died pending the appeal, the action was continued against James M. Veader, as his executor. Affirmed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Robert Hunter McGrath, Jr., for appellant.
Charles E. Rushmore, for respondents.

INGRAHAM, J.    This action was brought to foreclose a mortgage made by one William H. Buxton, the appellant's testator, to one Bainbridge Colby, and assigned by said Colby to the plaintiff Latimer, and was given to secure the performance of the covenants and conditions of a certain agreement bearing even date with the mortgage, viz. May 4, 1893. The condition of the mortgage was that "provided always that, if the said party of the first part, his heirs, executors, or administrators, shall faithfully do and perform all the covenants and conditions of the said agreement hereinbefore referred to on his part to be performed, that then these presents and the estate hereby granted shall cease, terminate, and be void"; followed by a covenant of the mortgagor that he "will faithfully perform each and every of the covenants and conditions of the said agreement with the said party of the second part by the party of the first part to be performed, and pay any and all sums of money therein referred to." The agreement described in the mortgage provides that whereas the said Buxton "is and for some time past has been the secretary of the Irving Savings Institution, a corporation organized under the laws of the state of New York, and it is claimed by the said institution, or some of the officers thereof, that said party of the first part is indebted to it for a large amount of money, which indebtedness, if any, was created under circumstances not herein set forth, but which may be shown if this agreement is ever sued upon in a court of law or equity; and whereas, the exact amount of such indebtedness, if any, has not been yet determined, but is about to be investigated and fixed, and, if any be found to exist, said party of the first part is to pay the same, and in the meantime desires and has agreed to secure the payment thereof by mortgage upon certain real estate owned by him; and whereas, the said savings institution has appointed the party of the second part to act for and to represent it in this agreement, and the party of the first part hereby recognizes the party of the second part in such capacity: Now, therefore, in consideration of the premises, and of the sum of one dollar to him in hand paid, and of other good and valuable considerations, receipt whereof is hereby acknowledged, the party of the first part covenants and agrees to and with the party of the second part as follows: First. That if, after an examination and investigation of his accounts and dealings with said Irving Savings Institution, there shall be found to be any indebtedness from said party of the first part to said institution, he will pay the same, with lawful interest thereon, on demand. Second. That the said institution shall have twelve months from the date hereof within which to complete such examination and investigation. Third. The party of the first part, contemporaneously with the execution of this agreement, having executed and delivered to the party of the second part a mortgage upon certain real estate owned by him, to secure the payment of whatever sum of money may be found to be due from said party of the first part to said institution as aforesaid, with the lawful interest thereon, and the faithful performance of the covenants and conditions herein contained, now, therefore, in the event that he shall fail to pay such indebtedness, with the interest thereon, as aforesaid, the party of the second part may avail himself at once of the said mortgage for the

purpose of realizing for the said institution the amount of such indebtedness, with interest and costs and expenses. If, however, upon the expiration of said period of twelve months above provided, no indebtedness from the party of the first part to said savings institution shall be found to exist, then the party of the second part shall cancel the said mortgage of record."

The complaint alleges the execution of this mortgage and agreement, and that, upon an examination and investigation of the accounts and dealings of said defendant William H. Buxton with said plaintiff Irving Savings Institution, it appeared that said Buxton was indebted to the said institution in the sum of $32,919.57, with interest. The answer of the defendant denies his indebtedness to the savings institution in any sum whatever, and the issue raised by this denial is the first question presented upon this appeal. It appears that the defendant entered into the employ of the savings institution in the year 1863 as a clerk; that subsequently there were in the employ of the said institution two clerks, of whom the defendant was one, whose duty it was to receive money from depositors, and pay it out to them. He continued to act in that capacity until the year 1890, when he was made secretary, in which position he continued down to the time of the execution of the mortgage and agreement before referred to. Those two clerks were known as first and second clerks. The first clerk was generally employed as paying teller, and the second clerk as receiving teller, of the bank, although each of the clerks from time to time performed the duties of the other. One Daniel D. Tompkins was the other clerk in the employ of the institution, from a period in 1873 down to May 4, 1893, the date of the mortgage and agreement in question. During all that time he was subordinate to the mortgagor, and, when the mortgagor became secretary, Tompkins became first clerk or paying teller. During the time, however, that Buxton was secretary, he also performed duties at the paying teller's and receiving teller's desks, in the way of paying out and receiving moneys. At the time Buxton became secretary, one Heaton was president of the institution, and Heaton's son then became the second clerk. About the year 1883, Tompkins commenced to have access to the cash of the bank, and from that time down it seems that all four of these officials from time to time appropriated the money of the bank to their own use. Some small appropriations, it seems, had been made prior to that time, and as far back as the year 1876; and these were accomplished by taking money from the bank, and substituting in place of it tickets which would represent the money taken, and which were counted in as cash. The books of the bank were balanced by treating the amounts specified in these tickets as so much cash on hand.

There is some doubt about the time that Buxton commenced this method of appropriating the funds of the bank, but it seems that from 1876 down there was always more or less of a defalcation by these officers. At the time of the examination of the bank by the banking department of the state, various means were used to cover up these defalcations. Tompkins testified that at one time Buxton called his attention to a ticket for $600 which he had in the drawer, and told him (Tompkins) that he must get it out of the drawer, when

Tompkins said, "I haven't got the money." Buxton said, "Charge it up to your wife's account." Tompkins did so. It seems that each of these parties had accounts with the bank in the name of their relatives, or others whose accounts were used for the purpose of covering up the defalcations; Tompkins having an account with his wife in her name before she was married, and also in the name of C. H. Fitch, C. M. Fitch, C. Mitchell, and the Anchor Lodge, and also an account in his own name. Buxton had two accounts which he used to cover up his defalcations, viz. Sarah R. Buxton and Leila M. Buxton; and it is to these accounts that most of the amounts appropriated by these two parties were charged. The appropriation of these moneys was concealed by either failing to charge the accounts with the moneys appropriated, by keeping some of the accounts in the old books of the bank, and by not transferring them to new ledgers when opened, or by not posting the particular accounts, which appeared upon the depositors' ledger largely overdrawn, to the general ledger of the institution. It appears that prior to the year 1893 the examination of these banks by the department and the officers had been confined to an examination of the general ledgers, the depositors' ledger not having been examined by either the examiners of the department or the trustees of the bank, and thus the defalcation had escaped detection. When, however, an examination was commenced about May 1, 1893, by the officers of the superintendent of banking, a new system was adopted, by which the depositors' ledger was examined, and then the defalcations were at once discovered. At first the only discovery that was made was the condition of the two accounts used by Buxton, and he was charged with having appropriated the money of the bank. He at once admitted the charge, claimed that he had appropriated about $25,000 of the bank's money, and made restitution to the bank of that amount. Tompkins at that time was absent from the bank on account of sickness, and there was no knowledge by the officers of the bank or the superintendent as to his defalcations. Buxton at once paid to the bank $25,000, which he claimed was the total amount appropriated by him. Subsequent to such repayment to the bank, Mr. Simon H. Stern was called in as legal adviser, and a consultation was held at the office of the bank, at which were present Buxton, Mr. Fancher, who was one of the trustees, Mr. Stern, the president of the bank, the superintendent of banking, and possibly some others. It had then been discovered that there was upward of $60,000 to be accounted for, and Buxton was charged with being responsible for this full amount. He, however, denied strenuously that any sum had been taken by him over and above the sum mentioned, and which he had restored to the bank, and claimed that the apparent deficiency was the result of mistakes or errors in the accounts, and that upon an examination of the books it would appear that the amount which he conceded had been due from himself, and which he had restored, was the full amount of the loss to the bank. Mr. Stern and the bank officers, however, insisted that he was responsible to the bank for the whole amount of the deficit, the information, however, then at their disposal not enabling them

to fix definitely either the amount or the nature of the deficit. It was first insisted that he should deposit with the bank a sum of money sufficient to make up the deficit, to be returned to him in case it was found that his statement was correct. This he stated he was unable to do, and that it was impossible for him to procure such a sum of money. He offered, however, to give to the bank security. The terms of that offer are disputed. Mr. Fancher, who appears to have acted for the bank, testified that at this conference, on the afternoon of May 4, 1893, "Mr. Buxton was told that there was a discrepancy found against him of about twenty odd or twenty-two or twenty-three thousand dollars; and he admitted that there was about $25,000 chargeable to him,—in other words, that he had taken,—and said that he had raised the money, and would make that good. Mr. Heaton [the president] was there at the time, and I asked him if that was so, and he stated that it was; that he had the money in the safe to pay the bank and the examiners for the deficiency." The bank examiners had found that the total deficiency was upward of $60,000, and that fact was communicated to Buxton. Mr. Stern then said to Buxton, "Now, Mr. Buxton, we have not finished this examination, and we have no means of knowing whether your statement is true or not; and you should make some other provision for the payment of what you may be responsible for." Buxton said, "I am perfectly willing to do that." Mr. Stern also said to him in that connection, "You are able to make this payment, and you are really the only responsible man here financially." Buxton made reply, "I am willing to make good anything that I am responsible for." Mr. Stern said to him, "Directly or indirectly responsible?" And he said, "Yes, directly or indirectly." Subsequently the parties met at the office of Mr. Stern, at which time the mortgage and collateral security were executed. Mr. Stern's testimony corroborated Mr. Fancher as to this interview, he stating that he said to Buxton, "I am informed that there has been $60,000 stolen from this bank, and that you are responsible for it." In reply to that Buxton said, "I haven't taken but a certain amount," mentioning twenty or twenty-two or twenty-three or twenty-five thousand dollars. He said, "I have paid that back." Buxton insisted at this interview that he had taken but $25,000; that nobody had stolen any more; and that the balance of the deficiency had been occasioned by errors and mistakes in the bank. Mr. Stern testified that Buxton further said that he was perfectly willing to give the bank security for anything that he might be responsible for. Mr. Stern then said to him, "Directly or indirectly?" to which he replied, "Yes." At Buxton's request, Mr. Stern drew up this agreement so that it would not disclose the actual state of affairs; and Mr. Stern assented to that, because he (Buxton) assured him that there was no necessity for that, as it would be found on examination that only $25,000 had been stolen. "That is all, and every dollar of that balance you will find is nothing but errors, and had been for many years." Mr. Stern further testified that he told Buxton that he (Stern) believed that Buxton had taken all and more, that he believed that he would be found to be responsible for the whole busi-

ness, and insisted upon security being given. Buxton, in his testimony, denied having made any promise to secure the bank for any amount for which he was responsible directly or indirectly; alleged that no claim was made that he was responsible for anything except the money that he had actually taken; and there was testimony of others present at this interview which corroborated Buxton's statement.

The first and serious question presented upon this testimony is as to the construction to be given to these instruments,—whether there was secured by this mortgage any amount for which Buxton was liable to the bank, and which, either through his connivance or negligence, had been taken by other employés of the bank. Subsequent investigations show that, in addition to the $25,000 which Buxton had repaid to the bank, there was due by him the sum of $4,333.80, which on May 7, 1894, he repaid to the bank. It also appeared that Tompkins had appropriated $23,702.17, and that Heaton, the other clerk, had appropriated $729.95; making a total of principal of $24,-432.12. For this sum, with interest, the court has awarded judgment, upon the ground that Buxton was responsible to the bank for the money thus appropriated by Tompkins and Heaton, the sum having been taken with his connivance or through his culpable negligence. And the first and serious question is whether, according to the terms of this mortgage, it covered a liability to the bank occasioned by Buxton's negligence, or liability for money taken by others. This agreement was, by the terms of the mortgage, made a part of it, and the condition of the mortgage was that the same should be void if Buxton performed all the covenants and conditions of the said agreement, and should pay any and all sums of money therein referred to. The amount due upon the mortgage must therefore be determined by the obligation assumed by Buxton under the agreement. The agreement recites the fact that Buxton had been the secretary of the institution; that it was claimed by the said institution or some of the officers thereof that Buxton was indebted to it in a large amount of money, which indebtedness, if any, was created under circumstances not therein set forth; that the amount of such indebtedness, if any, had not been ascertained, but, if any were found to exist, Buxton was to pay the same (that is, such indebtedness); and that, therefore, Buxton agreed that if, after an examination and investigation of his accounts and dealings with such institution, there should be found to exist any indebtedness from him to the institution, he would pay the same, with lawful interest thereon, on demand, with a further covenant that in the event that he should fail to pay such indebtedness, with interest thereon, as aforesaid, the mortgage should be paid at once, for the purpose of realizing for the institution the amount of such indebtedness, with interest, costs, and expenses. This was the obligation assumed by Buxton, which was secured by the mortgage. The claim by the institution was that Buxton was indebted to it in a large sum of money, and Buxton's obligation was that he would pay any indebtedness that should be found to exist in favor of the institution, with lawful interest.

Was a liability for the amount taken by Tompkins and Heaton an indebtedness of Buxton's to the institution? Using it in its strict legal significance, the word "indebtedness" applies only to an obligation arising from contracts express or implied; and the defendant strenuously insists that this obligation should be confined to a liability of this character. The word "indebtedness" is defined by Bouvier's Law Dictionary as the state of being in debt, without regard to the ability or inability to pay the same. The word "debt" has generally been confined to a contract obligation, and is defined in Blackstone as a sum of money due by certain and express agreement.

In the American & English Encyclopedia of Law it is said:

"Ordinarily, it imports a sum of money arising upon a contract, express or implied. In its more general sense, it is defined to be that which is due from one person to another, whether money, goods, or services; that which one person is bound to pay or perform to another." Volume 5, p. 143.

It has been expressly held, however, that "debt" does not include a liability in tort. 5 Am. & Eng. Enc. Law, pp. 148, 149, and cases cited in note 1 on page 149.

In Heacock v. Sherman, 14 Wend. 58, it was held in construing the word "debt," as used in a statute making stockholders liable for demands or debts of the corporation, that damage arising upon tort is not a debt accrued, within any reasonable construction of that term. There is, however, a much broader meaning given to the term than the definitions above given. Thus, in the Imperial Dictionary the word "debt" is defined as "that which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to or perform for another; that which one is obliged to do or suffer." And there are many cases in which this broader significance has been applied to the term. Thus, Judge Story, in the case of Carver v. Manufacturing Co., 2 Story, 451, Fed. Cas. No. 2,485, says: "It seems clear that in common parlance, as well as in law, the term 'debt' is, in a larger sense, sometimes used to denote any kind of just demand." And many other cases might be cited in which similar language is used.

In which sense was the word used by the parties to this instrument in question? I think that this is a case in which the court is justified in considering the negotiations which led up to the execution of these instruments, the situation at the time the instruments were executed, the nature of the demand made upon Buxton, and the object of the parties in executing the instruments, which is apparent from what was said and done at the time they were prepared and executed. A defalcation had been discovered, from which it appeared that upward of $60,000 had been stolen from this institution. It had been discovered that Buxton had appropriated a large portion of this money, he conceding that he had appropriated $25,000, which he had made good. He, as the responsible officer of the institution, was charged with the responsibility for the whole amount, and the reasonable claim was made that he should account for its disappearance if he was to relieve himself from liability for the whole amount. He insisted that the amount that he had restored was all that had been taken, and that the apparent discrepancy was the result of mistakes

or errors in bookkeeping, which would be readily ascertained upon examination. There was no evidence before the officers of this banking association that any one else had been concerned in the commission of the wrong to the company, and it is quite reasonable to suppose that if, upon an investigation, it was found that more of the funds were missing, the one who had admitted stealing $25,000 would be the party who would be responsible for the balance. He concedes that he had knowledge of the fact that the other officers of the association had from time to time appropriated money belonging to it. He nowhere claimed that he understood that that money had been repaid. He made no statement to the officers of the institution as to the robbery of the others, but insisted that no more had been taken; and when a demand was made that he should repay this sum, or at least secure the bank against any loss if it was discovered that a further defalcation had taken place, he expressly agreed that he would accept such responsibility, and would secure the bank. He stated to the officers that he was willing to make good anything that he was directly or indirectly responsible for, and it was to carry that intention into effect that the instruments were prepared and executed. He was not in a position to make terms. He must be presumed to have had a knowledge, even upon his own statements, of acts of these other employés which would at least justify any one in believing that the defalcations of his co-employés, of which he had had knowledge, with his own, were not the only ones which had depleted the funds of this institution; and we agree with the learned judge below that it is scarcely possible to conceive, considering his relations to this bank, and the terms he was on with the other employés and officers, that he did not know that they had applied the same methods to cover up their stealing as had been applied by him. It seems to us clear, considering this express intention with which Buxton executed this agreement, and the express object of the officers of the bank in obtaining this mortgage, that he must have understood that this term "indebtedness" was used in its ordinary significance, and that the agreement was intended to secure the bank against any liability of his to the bank, in relation to this deficit which had been discovered and which arose because of his relation to the bank. A careful examination of the whole case has convinced us that it was with this intent that the agreement was prepared, and that this meaning should be given to the language used.

In the case of Leggett v. Bank, 24 N. Y. 284, the court had under consideration the words "debt due," and the intention with which that phrase was used; and it was there held that those words included the contingent obligation of an indorser of a promissory note held by a bank. although, at the time when the obligation was sought to be enforced, the note itself was not due, and the liability of the indorser was only contingent upon the failure of the maker of the note to pay it; and, although there was a strong dissent in that case, both of the learned judges writing the opinions conceded that the words "debt due" would include an obligation that existed, although it was not payable until a future time. It is not necessary to multiply citations to show that, where one of two meanings can be given to a word

used in an instrument of this character, the court should consider the object for which the instrument was executed, to ascertain which of the two meanings the parties intended to use; and, looking at this case, it is apparent that it was the intention of all the parties that this mortgage should be given to secure all liabilities of Buxton arising out of his connection with the defalcation of this sum, and it was not intended to restrict it to the amount to which he could be said to be indebted to the bank upon a contract, or for money which he himself appropriated and used.

The other questions presented do not require an extended discussion. Upon the evidence, there can be no doubt that Buxton was liable to the bank for the money appropriated by his fellow employés. They were both his subordinates, to some extent under his control. They followed his example in appropriating the bank's money, and we think it clear from the evidence that he was negligent in allowing them to steal, and that he connived at their appropriating the money of the bank. The mere fact that he might not have been familiar with the extent of their appropriations would not relieve him from such liability. We think it also clear that he was responsible, not only for the money that was stolen after he became secretary, but for the money taken while he was the first clerk, occupying the position analogous to that of paying teller in other institutions. The most ordinary care in the performance of his duties would have shown him not only the fact that these other employés were stealing money from the bank, but the extent of their depredations. The least of the obligations that it can be held he assumed towards his employer required that, when he had knowledge that the money of the bank was being stolen, he should have acquainted the trustees with the facts, as he would undoubtedly have done but for the fact that he himself was engaged in similar appropriations of the funds of the bank. The security of institutions of this kind must depend upon the faithfulness with which the employés discharge the duties with which they are intrusted; and the liability of faithless officers in whom a trust is reposed should be strictly applied to all who so neglect their duties that their employers are robbed. This is especially so when the robbery is occasioned by, at least, the connivance and assistance of the officer in whom the trust is reposed.

We think the amount allowed by the court below as due from the defendant was proved, and that the plaintiff was entitled to recover the interest allowed. The agreement itself provides that, for any indebtedness of the defendant, interest should be allowed, and that could only mean interest from the time that the obligation to the bank accrued.

There are many exceptions to evidence in the record, but none of them are material. The only disputed fact was as to the agreement that the defendant made as to the effect of the security that he should give. The books were in court, and the exceptions to allowing the witness to testify to their contents are not available.

We think, on the whole case, that the judgment appealed from was right, and it is affirmed, with costs. All concur.