(153 App. Div. 697.)

GODLEY v. CRANDALL & GODLEY CO. et al.

(Supreme Court, Appellate Division, First Department.   December 13, 1912.)

1. CORPORATIONS (§ 151*)—DISTRIBUTION OF PROFITS—STOCKHOLDERS.

Where business is operated by the persons interested through a corporation, in order to avoid individual liability for debts and to prevent dissolution on the death of one of the parties in interest, all stockholders holding the same character of stock must receive the same treatment in the distribution of profits.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 555–559; Dec. Dig. § 151.*]

2. CORPORATIONS (§ 320*)—DIRECTORS—MISCONDUCT—MINORITY STOCKHOLDERS.

Where directors of a corporation are guilty of misconduct or dishonorable dealing for their own benefit, they may be compelled to account at the suit of a minority stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

3. CORPORATIONS (§ 155*)—DISTRIBUTION OF PROFITS—MISAPPROPRIATION OF FUNDS—DISCRIMINATORY DIVIDENDS.

Where directors of a private corporation, in voting extra dividends among employés, did not recognize length or faithfulness of service, but apportioned such dividends according to stockholdings, resulting in an arbitrary and unjust discrimination between the holders of the same class of stock, such distribution could not be sustained on the ground that it was in pursuance of a custom set by the original corporation in carrying out a scheme of profit-sharing with stockholding employés.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 560–563, 568, 576–578, 593–603; Dec. Dig. § 155.*]

4. CORPORATIONS (§ 153*)—FUNDS—DISCRIMINATING DIVIDENDS—MINORITY STOCKHOLDER—REPRESENTATIVE ACTION.

Where excessive and discriminating dividends have been voted and paid to certain stockholding employés of a corporation, they could not be recovered by a minority stockholder in a representative action for the benefit of the corporation, since the corporation cannot recover dividends it has paid, if earned, because it did not pay equal dividends to all the stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 579, 580; Dec. Dig. § 153.*]

5. CORPORATIONS (§ 308*)—OFFICERS—DIRECTORS—ADDITIONAL SALARIES—VALIDITY.

Payment of a part of the profits of a corporation to directors, who were officers of the corporation, as additional salary, which such directors voted to themselves, constituted a misappropriation of the corporation's funds, recoverable from them in a representative suit by a minority stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

6. CORPORATIONS (§ 312*)—DIRECTORS—SALARIES TO EMPLOYÉS—ACCOUNTING.

Directors of a corporation were not accountable for sums voted to employés, not directors, as additional salary in a representative suit by a minority stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1376–1386, 1388–1392; Dec. Dig. § 312.*]

7. CORPORATIONS (§ 320*)—MISCONDUCT OF DIRECTORS—ADDITIONAL SALARY.

Where, in a representative suit by a minority stockholder to recover money voted by directors to themselves as additional salary, the court

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

found that such sums were not measured by the services performed, but were determined by the amount of stock held by the directors, and expressly refused to find that such additional payments were reasonable and proper compensation, it was not material to a judgment for plaintiff that the court failed to find that the additional salaries were excessive.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

**8.** CORPORATIONS (§ 320*) — DIRECTORS — ADDITIONAL SALARY — BURDEN OF PROOF.

Where directors of a private corporation voted various sums to themselves as alleged additional salary, the burden was on them to justify the payment by establishing the value of their services.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

**9.** CORPORATIONS (§ 308*)—DIRECTORS—SALARIES AS OFFICERS—VOTE AS DIRECTORS.

A director of a corporation is disqualified to vote on a resolution fixing his salary as an officer.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

**10.** CORPORATIONS (§ 308*)—DIRECTORS—SALARIES TO OFFICERS—ILLEGAL INCREASE.

Where a resolution passed by the directors of a corporation voting additional salary to themselves as officers was invalid, but in a minority stockholder's representative action for an accounting it was proved that the services rendered by the officers were reasonably worth to the corporation at least what they had previously received as regular salaries, they were only required to account for the amount added pursuant to such resolution.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

**11.** CORPORATIONS (§ 312*)—GOOD WILL—TRANSFER.

Since the directors of a corporation may not dispose of its tangible property without accounting therefor, and its good will is an asset which must be accounted for on dissolution, where the majority stockholders of a corporation, after being unable to purchase the shares of the minority at par when they were worth much more, on the business being temporarily disabled by fire, organized a new corporation and appropriated the business and good will of the old, in order to "freeze out" the minority stockholders, they were accountable in a representative suit by the minority stockholders for the reasonable value of such good will.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1376–1386, 1388–1392; Dec. Dig. § 312.*]

12. CORPORATIONS (§ 320*)—PERSONS LIABLE—PARTIES.

Where directors of a corporation, by their illegal efforts to freeze out the minority stockholders, made necessary a representative suit by the minority interest for an accounting, they were bound to account for legal fees and expenses paid out in and about the defense of the action, together with the amount paid for premium on a bond to discharge a receiver therein, in order to prevent the improper imposition of such expenses on the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

Ingraham, P. J., and McLaughlin, J., dissenting in part.

Appeal from Special Term, New York County.

Suit by Elizabeth McM. Godley against the Crandall & Godley Company, the Crandall-Pettee Company, and others. Judgment for complainant, and defendants appeal. Affirmed.

See, also, 137 App. Div. 923, 122 N. Y. Supp. 1129; 143 App. Div. 908, 127 N. Y. Supp. 1121.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Decker, Allen & Storm, of New York City (Edgar T. Brackett, of Saratoga Springs, of counsel, and James J. Allen, of New York City, on the brief), for appellants.

King & Osborn, of New York City (W. Russell Osborn, of New York City, of counsel, and David Bennett King, on the brief), for respondent.

CLARKE, J. This is a representative action, brought by a stockholder of the Crandall & Godley Company to compel certain of the defendants to pay back to the corporation: (1) Moneys fraudulently paid out to themselves and others under the guise of additional salaries; (2) money paid out as salaries illegally voted to themselves as directors, under resolution of November 14, 1906, under the guise of increased salaries; (3) the value of the good will of defendant Crandall & Godley Company, fraudulently transferred by the defendants to the defendant Crandall-Pettee Company.

In 1871 a copartnership was formed between the late William Ziegler, Allan B. Crandall, and William D. Godley, under the name of Crandall & Co., to carry on in New York and elsewhere the business of dealing in grocers', confectioners', and bakers' fixtures, utensils, and supplies; each of said parties having a one-third interest. In 1878 Ziegler sold his one-third interest to Crandall, and the business was continued as Crandall & Co. In 1887 Crandall died. Godley and Lyman F. Pettee formed a copartnership and continued the business under the name of Crandall & Godley. Pettee having purchased the interest of Crandall, Godley had a two-thirds and Pettee a one-third interest therein. Said copartnership continued until 1892, at which time they were equal partners, when they obtained the incorporation of the Crandall & Godley Company under the laws of the state of New Jersey. The capital stock was $300,000; $200,000 common, and $100,000 8 per cent. cumulative preferred, stock. Godley and Pettee each received one-half of each issue of preferred and common stock, except 40 shares held by one Isaac Karlsruher. Godley was elected president, with a salary of $5,000 per year, and Pettee vice president and treasurer, at a salary of $3,000 a year, which salary, pursuant to agreement, was equalized by Godley giving to Pettee the sum of $1,000 per annum, making the salary received by each $4,000. The Crandall & Godley Company of New Jersey purchased the good will of Crandall & Godley, the copartnership, for the sum of $132,354.54, which amount was thereafter carried upon the books of the defendant Crandall & Godley Company as "franchise account" until the time of the discontinuance of its business.

In 1895 the defendant the Crandall & Godley Company was organized under the laws of New York by Godley, Pettee, and Karlsruher, who subscribed for the entire capital stock—Godley, 1,410 shares; Pettee, 1,380 shares; and Karlsruher, 40 shares. Upon its organization the new company took over the assets and good will of the Crandall & Godley Company of New Jersey and delivered to the trustees of said corporation its entire capital stock, consisting of 2,000 shares of common and 1,000 shares of 8 per cent. cumulative preferred stock, which was transferred and delivered to the stockholders of the New Jersey corporation according to their interests therein, and the said New Jersey corporation was thereupon dissolved. Godley became ill and incapacitated during the month of May, 1895, and the remaining members of the board of directors, Pettee and Karlsruher, on August 13, 1895, adopted a resolution discontinuing the salary of Godley as president and voting the same to Pettee, who was then the vice president, thereby increasing his salary as such for so long as he performed the duties of the president. At a stockholders' meeting held on the 2d of March, 1896, Pettee, Karlsruher, and Eugene Cookingham were elected directors.

During the existence of the New Jersey corporation, Godley and Pettee entered into an agreement with certain of the company's employés whereby they each sold an equal amount, 255 shares, of their common stock, agreeing that the purchasers pay for the same out of the dividends alone which might be declared upon the same, together with 6 per cent. interest upon the unpaid balance of the purchase price, until said stock was fully paid for. While the purchase price remained unpaid, Godley and Pettee, respectively, continued to hold the same as collateral security, with the power to vote the same. Upon the organization of the New York company, the said purchasers received an equal number of shares in said company, which shares were held by said Godley and Pettee under the same form of agreement. Godley died in December, 1897, leaving the plaintiff his widow, and a last will and testament making her his sole legatee and executrix, and she is now the owner of all his stock—615 shares of the common and 430 shares of preferred stock.

The directors of the New Jersey corporation declared a dividend of 15 per cent. on the common stock for the year 1892, also a dividend of 5 per cent. for the year 1893; but the holders of the common stock each received an amount which in the aggregate was equal to the sum of 15 per cent. upon the common capital stock. They did not declare a dividend for the year 1894, but the holders of the common stock received a sum equal to 13 per cent. The dividend of 15 per cent. declared in 1892, and the additional salary of $10,000 to Godley and Pettee voted for 1893, were credited on the company's books to "stock account." The amounts equal to 15 per cent. for 1892, 15 per cent. for 1893, and 13 per cent. for 1894 were paid to and received by all the holders of the common stock in accordance with their respective holdings thereof, under the name of dividends for the same years. There is no evidence that it was the custom of and during the existence of the New Jersey corporation to exclude any holder of common stock

from an equal share in the distribution of the profits in accordance with their holdings.

On the 8th of July, 1896, the board of directors of the New York company, consisting of Pettee, Karlsruher, and Cookingham, adopted the following resolution:

"In order to show due appreciation to some of our best and trusted employés, be it resolved, that we make to those an increase in salary for the year 1895 an amount that we can agree upon to those we deem worthy according to their ability and service to the company, as has been the custom heretofore."

The said directors declared a dividend of 6 per cent. for the year 1895, and, claiming as their authority the above resolution, an additional amount equal to 9 per cent. per annum to themselves and all other holders of the common stock, save and except Godley. The court found specifically:

"That the action of the board of directors under the resolution of July 8, 1896, was the first in either the New Jersey or New York companies where the holders of the common stock did not all share equally in the annual distribution made to them by the directors of the company."

On the 1st of March, 1897, the said directors adopted the following resolution:

"Be it resolved, that in order to show due appreciation to some of our best and trusted employés, we make to those an annual increase in salary, to continue until revoked by the board of directors."

Claiming authority under said resolution, the directors, at the direction or under control of Pettee, from the year 1895 to the year 1905, inclusive, paid to themselves and all holders of common stock, who were employés, a sum equal to 9 per cent. per annum on account of such holdings, which payments were continued and made to said stockholding employés, who were neither officers nor directors, for the years 1906, 1907, and 1908; but neither William D. Godley, nor the plaintiff, nor any person similarly situated, participated therein. The additional amounts of 9 per cent. per annum paid to certain holders of common stock employed in the business of the company, and called by the directors "additional salaries," were not measured by the services performed by such shareholders, but were determined by the amount of the stock so held by them, and said employés who held no stock got no so-called "additional salary." The stock which had been sold to certain employés was not allotted to them in amounts measured by the importance of their services nor by their ability.

The defendant Lyman F. Pettee planned and schemed, and declared his purpose, to, and did, exclude William D. Godley and this plaintiff from all participation in the profits in excess of 6 per cent. dividends on the common stock, except in the year 1907, when 7 per cent. thereon was paid.

The board of directors, consisting of Lyman F. Pettee, Charles Finckenstadt, and William Pfeiffer, at a meeting held November 14, 1906, voted to themselves increases in salary for the year 1906 as follows: Pettee, as president, from $5,200 to $15,000; Pfeiffer, as

vice president, from $2,590 to $4,500; Finckenstadt, as secretary, from $2,600 to $5,000—and increased the salary of William C. Pettee, a son of Lyman F., as treasurer, from $1,200 to $3,000, and in and by said resolution directed that the payment of the increased salaries continue until further action of the board of directors. Pursuant thereto the directors paid to themselves and to the said William C. Pettee said salaries as thus increased for the years 1906, 1907, and 1908. Said resolution was by its terms retroactive, in so far as it voted salaries for the year 1906. After the adoption of said resolution, said directors and officers discontinued the payment to themselves of the aforesaid additional and annual payments of 9 per cent. on their respective holdings of common stock.

Lyman F. Pettee, after the Crandall & Godley Company discontinued its business on January 7, 1909, received the sum of $11,000 as salary for the year 1909, and the sum of $2,500 for the quarter ending May 1, 1910. The board of directors voted to Pettee, as member of said board, on May 1, 1910, salary at the rate of $15,000 per annum for the period from January 1, 1909, to July 1, 1909, and caused to be paid to him therefor the sum of $7,500. Pettee, controlling the majority of the capital stock, refused representation on the board to plaintiff, holding upwards of one-third of the capital stock, though demanded, and at all times refused a statement of the financial condition of the company, save and except for the year 1906. He endeavored from time to time to purchase the plaintiff's stock, at the same time refusing information as to the financial condition of said company. About May 5, 1905, he advised plaintiff to sell her common stock at par, when for the year ending September 31, 1904, the total net earnings, exclusive of said additional amounts of 9 per cent. were $100,246.97, and the company had a surplus of $242,509.76 over and above the company's indebtedness, including its capital stock. Pettee in the summer of 1908 sought to purchase plaintiff's stock, advising her that his purpose was to acquire plaintiff's interest for the purpose of turning over the entire business to his sons, and at the same time refused all information as to the financial condition of the corporation. Prior to said offer to purchase, he had caused a dividend to be passed for the year 1907, on the common stock, though the net earnings for the year 1907 were upwards of $40,000, and the corporation had a surplus of $243,276.47.

On January 7, 1909, the premises of the Crandall & Godley Company were substantially destroyed by fire. At that time the board of directors consisted of Lyman F. Pettee, holding 1,348 shares, William Pfeiffer, holding 225 shares, and Charles Finckenstadt, holding 1 share, making in all 1,574, a majority of the capital stock. The directors made no effort to continue the business, although they could have done so, and there was no good reason why they should have abandoned the old corporation. On the 31st of December, 1908, the Crandall & Godley Company had (exclusive of good will and franchise account, carried on the books at $132,000) assets of $534,439.13, which amount included merchandise at $195,682.30, and liabilities (exclusive of capital stock) of $54,326.31, and the sum of $19,314.40 owed to

defendants L. F. Pettee, Finckenstadt, Pfeiffer, and W. C. Pettee, amounting in all to $73,640.71. Immediately after the fire, and at the time of the discontinuance of its business, the said company was possessed of substantially all the aforesaid assets, except its merchandise, which was claimed as a total loss against the insurance companies, and allowed by them at the amount of $195,000, which was duly paid and received by the company between the 20th of January and May 1, 1909.

The defendants William Pfeiffer and William C. Pettee, shortly after the fire, and on the 14th day of January, 1909, organized a new corporation, the Crandall-Pettee Company, for the purpose of continuing, and they did so continue, the business of the Crandall & Godley Company, under the name of and by the defendant Crandall-Pettee Company, and the defendant Finckenstadt joined them in the capacity of credit man. The defendants Lyman F. Pettee and Finckenstadt continued as officers and directors of the Crandall & Godley Company after the fire, and the defendant William C. Pettee continued as treasurer of the Crandall & Godley Company, and at the same time as president and general manager of the Crandall-Pettee Company. Pfeiffer on the 13th of January, 1909, resigned as a director of the Crandall & Godley Company, and became one of the incorporators of the Crandall-Pettee Company. Finckenstadt was elected vice president of the Crandall & Godley Company on the 13th of January upon the resignation of Pfeiffer, and upon the organization of the Crandall-Pettee Company entered its employment and continued as vice president of the Crandall & Godley Company. The defendants Lyman F. Pettee and Finckenstadt, as directors of the Crandall & Godley Company, permitted the Crandall-Pettee Company to take over its business and good will. Pettee and Finckenstadt permitted the Crandall-Pettee Company to hold itself out as successor to the Crandall & Godley Company, and use all of its brands, trade-names, and trade-marks, giving it full access to the books of account of the Crandall & Godley Company, permitting it to use its horses, trucks, and automobiles. They made no effort to sell its brands, trade-marks, good will, and business. They permitted the Crandall-Pettee Company full access to correspondence, permitted it to take and fill orders for merchandise sent by mail to the Crandall & Godley Company by its customers, and to take, use, and appropriate to its own use, and without compensation, the good will and business of said company. They did in bad faith conspire with Pfeiffer and William C. Pettee to turn over and deliver to the Crandall-Pettee Company the business and good will of the Crandall & Godley Company, for the purpose of having the business continued and enjoyed to the Crandall-Pettee Company, and for the purpose of excluding plaintiff and all other stockholders similarly situated from further participation in said business and the good will thereof, without compensation, to the said Crandall & Godley Company. Lyman F. Pettee, Finckenstadt, and Pfeiffer procured the reduction of the capital stock of the Crandall & Godley Company from $300,000 to $15,-000, and by said reduction the capital became and is wholly inadequate for the continuance of its business. By reason thereof, and the ap-

propriation of its business by the Crandall-Pettee Company, the Crandall & Godley Company is now unable to continue its said business; and the board of directors in bad faith discontinued the business.

The court found that the Crandall-Pettee Company, with a capitalization of $50,000, took over and successfully continued the business of the Crandall & Godley Company, and that the value of the good will of the Crandall & Godley Company was $90,000; that it paid for legal services in defense of this action, and since the commencement thereof, the sum of $6,991.71.

The judgment directs: That the executors of Lyman F. Pettee pay the Crandall & Godley Company moneys paid out of the funds and treasury of said defendant during the period when he was a director and president: (1) All moneys so paid from December 31, 1895, to January 1, 1909, under the name of "additional salaries," to himself and certain officers and directors and employés holding common stock, amounting to the sum of $207,821.39; (2) all moneys paid under resolution of November 14, 1906, as salary to himself, Finckenstadt, and Pfeiffer, amounting to the sum of $91,507.50; (3) all moneys paid to himself under the resolution of May 1, 1910, as salary, amounting to the further sum of $15,418.75; (4) the value of the good will, amounting to $90,000; (5) legal fees and expenses paid out in and about the defense of this action, $7,760.80; (6) amount paid as a premium on a bond to discharge a receiver herein, amounting to $1,-100—the said sums amounting in all to the sum of $413,608.44. That the defendant Finckenstadt account and pay to the company all moneys paid out of the funds and treasury during the period when he was a director from March 1, 1903: (1) All moneys so paid from December 31, 1903, to January 1, 1909, under the name of "additional salaries," to himself and certain officers and directors and employés holding common stock, $51,628.04; (2) moneys paid under a resolution of November 14, 1906, as salary to himself, Pettee, and Pfeiffer, $91,-750; (3) moneys paid to Pettee as salary under the resolution of May 1, 1910, $15,418.75; (4) good will, $90,000; (5) legal expenses, $7,-760.80; (6) premium on bond, $1,100—in all $257,415.09. That the defendant Pfeiffer account for and pay to the company all moneys paid during the period when he was a director: (1) All moneys so paid under the name of "additional salaries," from March 1, 1906, to January 12, 1909, amounting to $7,049.02; (2) paid under the resolution of November 14, 1906, as salary to himself, Pettee, and Finckenstadt, $91,570.50; (3) the good will, $90,000—amounting in all to $188,556.52. That the defendant William C. Pettee account for and pay to Crandall & Godley Company the value of the good will, $90,-000. That the Crandall-Pettee Company account and pay for the good will, $90,000. That the defendants Crandall-Pettee Company, Finckenstadt, Pfeiffer, William C. Pettee, and the executors of Lyman F. Pettee pay the sum of $1,000 as extra allowance, and $738.90 costs.

[1, 2] The basic reason of the corporate disputes which have produced the crop of representative actions, similar to the case at bar, is this: The original members of a joint enterprise or partnership en-

gaged in trade, business, or manufacturing, seeing certain real advantages in incorporation—the two most important being (1) a limitation of personal liability for the debts of the business to the amount invested therein, and (2) freedom from dissolution by reason of the death of a partner—transform the trading partnership into a business corporation, the partners receiving stock in proportion to their interests. So long as they all live, and agree, they treat it as a partnership, and, whether they distribute the surplus profits among themselves as dividends or by way of salaries, the financial result is precisely the same, and there is no one to complain. But when a partner (that is, such a stockholder) dies, or, by reason of disagreement with the majority, is ousted from the management, the majority refuse to regard the stock of that deceased or ousted partner as entitled to the treatment that he was when alive or in agreement. They think that, as they do the work and have the responsibility, they are entitled to keep to themselves, and divide among themselves, all, or the substantial part, of the profits or gains of the business, thus losing sight of the fact that the very form of the enterprise which they have created, to wit, a corporation, which has conferred upon them the benefits of a limitation of liability and a survival notwithstanding the death of a member, couples with those advantages the equality of all the stock, irrespective of ownership, whether original or recent, and irrespective of the participation in the affairs of the company or of the work or labor for it. All the stock is on the same basis of partnership inter sese, and the right of the majority, or the surviving original partners, to still treat the enterprise as their own and as they will, has ceased. That is the penalty, or payment, which they have to make for the original advantage which they have received by incorporating. It is for this reason that, chafing under the legal necessity of treating all the stock alike, and of dividing the profits pro rata to the holders thereof, they become ingenious in devising methods to evade and avoid their corporate responsibilities. The only safeguard lies in strict adherence to the equitable principle that the directors are fiduciaries, and may not, therefore, deal with themselves. The court is still the refuge and the support of the minority. Whenever a minority stockholder can show that the directors, his fiduciaries, have deviated from the path of square and honorable dealing for their own benefit, the court will exercise its power to right the wrong.

So long as William D. Godley was alive and in good health, Lyman F. Pettee and he conducted the affairs of the successive corporations upon the practical basis of a copartnership. During the existence of the New Jersey corporation, all the common stock was treated alike. Godley's illness and incapacity occurred at about the time of the formation of the New York corporation. Immediately thereafter Godley was deprived of a participation in the profits of the business in excess of the regularly declared dividends. His salary ceased, and was appropriated by Pettee during the short remainder of his life. After his death all the holders of the common stock, with the exception of Mrs. Godley, received a sum equal to 9 per cent. upon their stock holdings in addition to the regularly declared dividends; the result being that from 1895 down to and including 1905 Lyman F. Pettee re-

ceived, upon the basis of his holdings of common stock, in excess of the regular dividends which were paid to plaintiff and upon the basis of 9 per cent. thereof, the sum of $65,943. During all of this time he was a director of the company, in receipt of a regular salary, and voted for and directed said additional payment to himself. Cookingham, who was a director from 1896 to 1902, received $5,400; Washburn, who was a director from 1898 to 1906, received $3,800; and Finckenstadt, who was a director from March 1, 1903, received to and inclusive of the year 1905 $2,700 under the same conditions. These payments were either extra dividends upon stock or were additional salaries voted and paid by directors to themselves.

[3] 1. Considering them as dividends: The only justification alleged for discrimination among stockholders of the same class of stock is that the New York corporation followed the custom set by the New Jersey corporation, and that this was a justifiable scheme of profit-sharing with stockholding employés. The court found there was no such custom. The basis of recognizing faithful services is one thing. If the board of directors had recognized length and faithfulness of service by increased salary, no minority stockholder, in a representative action, would have the right to complain, for the internal management of the affairs of a corporation is intrusted to the directors and officers. But the distribution of the common stock was not made among the employés upon any proportional basis of length or ability of service, nor were the increased amounts paid to them gauged by any such rule. The amounts were arrived at as dividends are arrived at and paid, not in accordance with services, but in accordance with stock holdings, resulting in an arbitrary and unjust discrimination between the holders of the same class of stock, which stock represents in law investment in the company, and not payment for services.

[4] Considered as dividends, there can be no justification for such discrimination. Jones v. Terre Haute & Richmond R. R. Co., 57 N. Y. 196. But if this be so, and these sums paid to the directors, as well as to all the other stockholders who were employés of the company, are to be considered as improper and discriminating dividends declared and paid, I do not think they can be recovered in this action. It is a representative action. In such an action the plaintiff is asserting the right of the corporation. In such an action the complaint should set forth but two things: First, the cause of action in favor of the corporation; and, second, the facts which entitle the plaintiff to maintain the action in place of the corporation. Kavanaugh v. Commonwealth Trust Co., 181 N. Y. 121, 73 N. E. 562. The corporation cannot recover dividends it has paid, if earned, because it did not pay all the stockholders. The stockholder may have an individual action against the corporation to recover dividends which should have been paid to her. Peckham v. Van Wagerner, 83 N. Y. 40, 38 Am. Rep. 392. But this is not that action. She sues, not in her own right, but that of the corporation.

[5] 2. The appellants strenuously contend that these payments were not dividends, but were additional salaries. They point out that they were credited at the end of each year, while the regular dividends were

declared at a meeting of the board of directors in March of each year for the preceding year; that they ceased to be paid when an employé died or left the employ of the company. They assert, as the authority for the payment thereof, the resolutions of July 8, 1895, and March 1, 1897; the latter reading:

"Be it resolved, that in order to show due appreciation to some of our best and trusted employés, we make to those an annual increase in salary, to continue until revoked by the board of directors."

In neither of the resolutions is there an allusion to any stock, or to any percentage thereof, as the basis of the increase in salary. In the letter of Washburn of April 17, 1906, a former director and a witness for the plaintiff, he says:

"I particularly refer to my special salary account, on which there is due me, I believe, $112.65. * * * The special salary is reckoned at $450 per annum, or 9 per cent. on $5,000 stock holdings."

And Finckenstadt, a director and the secretary of the corporation, testified:

"The resolution to make payments to our best and trusted employés included Pettee. He was a director. Q. Can you state whether it was determined which of your employés, officers, and directors came within the class described by the resolution? A. My instructions from Lyman F. Pettee. Q. In other words, Mr. Pettee determined those questions? A. I suppose, with the directors. After I became a director, acting under the resolution of March, 1897, I received the same directions from Pettee."

Accepting the claim of the appellants, there seems no escape from the conclusion that the defendant directors are accountable for the sums thus paid to directors during their several terms of office. The validity of payments made to themselves by directors has been carefully considered by this court in the case of Carr v. Kimball, 139 N. Y. Supp. 253, handed down at the present term of the court, and the above proposition is fully supported by the cases there cited. Butts v. Wood, 37 N. Y. 317; Kelsey v. Sargent, 40 Hun, 150; Copeland v. Johnson Mfg. Co., 47 Hun, 235; Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Bosworth v. Allen, 168 N. Y. 157, 61 N. E. 163, 55 L. R. A. 751, 85 Am. St. Rep. 667; Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152, 76 N. E. 1075; Miller v. Crown Perfumery Co., 57 Misc. Rep. 383, 109 N. Y. Supp. 760, affirmed 125 App. Div. 881, 110 N. Y. Supp. 806; Davids v. Davids, 135 App. Div. 206, 120 N. Y. Supp. 350; Fitchett v. Murphy, 46 App. Div. 181, 61 N. Y. Supp. 182.

[6] We do not think, treating these payments as salaries, that the directors are accountable for the sums paid to other employés, not directors, for the reasons stated in Carr v. Kimball, supra.

[7] The appellants claim that there is no finding of the court that the additional salaries so paid by the directors to themselves were excessive. But the court refused to find, at the request of the appellants, that the sums thus severally paid as additional salaries were reasonable, and a proper sum to be paid for the services rendered by them, respectively; and the court did find that the additional salaries were not measured by the services performed in the service of the company,

but were determined by the amount of stock held, and said employés who held no stock got no so-called "additional salary."

[8] It having been established that these additional salaries were paid by the directors to themselves, the burden was upon them of justifying the payment by establishing the value of their services. We are satisfied that a recovery of these amounts is right, and that Pettee should be charged with $65,943 paid to himself, $3,600 paid to Washburn while he was a director, $5,400 paid to Cookingham while he was a director, and $2,700 paid to Finckenstadt while he was a director, making in all the sum of $77,643, and that Finckenstadt should be charged with $2,700 paid to himself, $1,350 paid to Washburn, and $17,955 paid to Pettee during his directorate, amounting in all to $22,005. No additional salaries to directors appear to have been paid during the period that Pfeiffer was a director.

[9] 3. On the 14th of November, 1906, the board of directors, consisting of Pettee, Finckenstadt, and Pfeiffer, voted to themselves increases of salary for the year 1906 as follows: Pettee, as president, from $5,200 to $15,000; Pfeiffer, as vice president, from $2,590 to $4,500; and Finckenstadt, as secretary, from $2,600 to $5,000; and these salaries were continued to 1909. After said resolution, none of the said directors received anything on account of so-called "additional salaries" upon the basis of 9 per cent. of their stock holdings.

These increases come precisely within the condemnation of the cases heretofore alluded to, prohibiting directors from voting salaries to themselves as officers. The court refused to find, at the request of the appellants, that the salaries paid pursuant to the resolution of November 14, 1906, were reasonable and proper sums to be paid for the services rendered therefor, and it did find that the services rendered by said officers were substantially the same after the passage of said resolution as prior thereto; that the resolution by its terms was retroactive, in so far as it voted salaries for the year 1906; that at the time of the increase under said resolution the volume of business transacted by the company was substantially the same as in its preceding year, and not so large as in the year 1902; and as a conclusion of law that the resolutions providing for the payment of said salaries were and are illegal and invalid, and the judgment requires the full amount to be accounted for.

[10] This latter conclusion we think erroneous. The evidence established that the services rendered by such officers were reasonably worth to the corporation at least what had theretofore been paid to them as regular salaries, and they should have been allowed those amounts.

[11] 4. When we come to consider the transactions connected with the discontinuance of the business of the Crandall & Godley Company, and the formation of the Crandall-Pettee Company, it would seem to present a case of consummation of the long-cherished design to get rid of the Godley interests, in which the Pettee interests took advantage of the fortuitous circumstance of the fire to "freeze" Mrs. Godley out and to turn the whole business of this long-existing and successful concern over to a new corporation, formed by practically the

same interests, with the single exception of the plaintiff. The business was a going concern. Its good will, when formed, was valued at $132,000, and so carried on its books. It had been prosperous. It was completely insured. The new company went right on with all the existing paraphernalia and plant which had not been wiped out by the fire—the old customers, the old trade-marks, the old horses and wagons, with the old employés. Everything was continued, with the exception of a name and the extermination of the Godley interest. The Crandall & Godley Company has not been dissolved. It still exists as a legal entity; but it has practically ceased to exist as a business concern. Its capital has been reduced to a nominal sum. This condition was brought about deliberately by its directors. In People v. Ballard, 134 N. Y. 269, 32 N. E. 54, 17 L. R. A. 737, Judge Vann said:

"All the authorities in this state are uniform in holding that the trustees of a corporation cannot so dispose of its property as to virtually end its existence and prevent it from carrying on the business for which it was incorporated" (citing cases).

It is true that Lyman F. Pettee did not take any stock in the new company; but his son did, and the father promised him his backing. Of course, the court cannot compel the continuance in business of the Crandall & Godley corporation, nor undo the acts by which its capital stock was reduced. But it can say that the successor company shall not appropriate, without payment, the good will of a business which had been in existence in one form or another for 41 years, and that those perpetrating such a transaction, and the beneficiary thereof, shall pay to the despoiled company the fair value of that which it has so taken. There is no complaint made of the method of ascertaining the value of the good will and the amount thereof, provided that the plaintiff is entitled to have that item considered and the value thereof accounted for and paid to the Crandall & Godley Company. It was that used in Von Au v. Magenheimer, 126 App. Div. 257, 110 N. Y. Supp. 629, affirmed 196 N. Y. 510, 89 N. E. 1114.

The tangible property of the Crandall & Godley Company could not have been disposed of by its directors and appropriated by the Crandall-Pettee Company without an accounting therefor. The good will was property. It is an asset of a copartnership, which on dissolution must be sold and accounted for. Slater v. Slater, 78 App. Div. 449, 80 N. Y. Supp. 363; Id., 175 N. Y. 143, 67 N. E. 224, 61 L. R. A. 796, 96 Am. St. Rep. 605; Matter of Silkman, 121 App. Div. 202, 105 N. Y. Supp. 872, affirmed 190 N. Y. 560, 83 N. E. 1131. It is an assignable asset of a bankrupt copartnership, which passes to the trustee in bankruptcy, and upon a sale by the trustee passes to the purchaser. Freeman v. Freeman, 86 App. Div. 110, 83 N. Y. Supp. 478.

In White, Corbin & Co. v. Jones, 79 App. Div. 373, 79 N. Y. Supp. 583, an action upon a stockholder's liability, on the claim that the property which made up the assets of the corporation had been knowingly overvalued, and that the capital stock had not been fully paid up, it was held that the good will of two firms, whose property had

become vested in the corporation, whose name was in no way derived from or suggested either of said firms or any of their members, must be taken into the account and estimated as property in the same manner as the machinery and tangible property was appraised.

If these decisions represent the law of the state, it follows, upon the findings of the Special Term, that this good will, permitted to be appropriated by the scheme and device adopted, must be accounted for by the unfaithful directors, who permitted, and the individual and corporate defendants, who profited thereby.

If modern business is to continue to be conducted by these artificial entities known as corporations, which are incapable of doing anything in and of themselves, but must be guided, controlled, and governed by directors and managers, the courts, when appealed to, must see to it that those directors and officers act honestly, straightforwardly, and with a regard to the principles of equity which have been so often laid down.

[12] 5. The appellants object to the provision of the judgment requiring the payment of the legal fees and expenses paid out in and about the defense of this action and the amount paid as a premium on a bond to discharge a receiver herein. It would seem as if the directors of the company, who were responsible for the conditions which required the action, should pay such expenses, instead of the corporation itself.

The judgment appealed from should be modified as indicated, and, as modified, affirmed, without costs to either party on this appeal. The amounts stated therein will be materially changed, and many of the findings will have to be modified. Our conclusions, however, are sufficiently supported by the facts as found, and we are of opinion that under the recent amendment of section 1317 of the Code of Civil Procedure an order can be made doing justice to all parties and thereby avoiding the necessity of a new trial, which, in view of the voluminous record, would be unfortunate.

INGRAHAM, P. J. I concur with Mr. Justice CLARKE in his opinion so far as it affects the additional sums of money which the trustees voted to themselves over and above the regular salaries that had been paid prior to the time that the increases were allowed, but I do not concur in the conclusion at which he arrives in regard to the good will of the Crandall & Godley Company.

After William D. Godley became ill and incapacitated in May, 1895, the entire management and control of the company devolved upon Lyman F. Pettee, who seemed to have been the controlling manager of the corporation from that time until the company discontinued business in consequence of the destruction of its plant by fire. Before that time Lyman F. Pettee had become seriously ill, and for some time prior to the fire had been unable to devote very much time to the business of the company. So far as appears, there was no one representing the plaintiff's interest in the company who had the capacity or was able to take charge of rehabilitating the company and continuing its business after its plant and property had been destroyed. Ly-

man F. Pettee was unable, by reason of the condition of his health, to continue the business, and he died about a year afterwards. There was no obligation upon his sons, who would succeed to his property after his death, as they were not officers of the company, and were under no obligation as trustees or otherwise to continue the business. The company had a large amount of assets, which included the insurance on the property destroyed by the fire. But it appeared that after Lyman F. Pettee had been unable to devote his time and ability to the service of the company the business had ceased to be profitable, and the year before the fire the business was considered at a loss of upwards of $8,000, instead of the large profit that had been made prior to that time. I do not think that the determination of the directors of this company to discontinue the business was fraudulent, or imposed upon them any liability. In fact, as I read this record, they neither had the ability nor the means to reconstruct the plant and continue the business. It was their duty, however, to wind up the affairs of the company to the best interest of the stockholders, and undoubtedly the good will of the business was an asset that should have been disposed of for the benefit of the stockholders.

Nor do I think that the act of the son of Lyman F. Pettee and his associates, who organized the Crandall-Pettee Company and started the business, made them liable to the plaintiff or to the Crandall & Godley Company for the organization of that company, or for their acts in obtaining so far as they could the customers of the Crandall & Godley Company. They were under no fiduciary obligation to the plaintiff, or to the Crandall & Godley Company, and I do not think the evidence sustains the conclusion that Lyman F. Pettee, considering the condition of his health at the time, was an actual participant in the organization of that company, or was guilty of any fraud which would impose upon his estate a liability for whatever of the good will of the Crandall & Godley Company as was secured by the Crandall-Pettee Company. The charge is that the directors of the Crandall & Godley Company permitted the Crandall-Pettee Company to conduct this business in such a way that it secured a large portion of the business of the Crandall & Godley Company. Just what this "permitting" means, or why it should impose a liability upon the directors of the Crandall & Godley Company, I do not understand. What else could these directors do? They certainly could not prevent the Crandall-Pettee Company from doing business, or from selling to the customers of the Crandall & Godley Company who wished to deal with the new corporation. The situation was peculiar. Lyman F. Pettee had been the controlling influence in the management of the Crandall & Godley Company, and it was under his management and control that the company for years had been able to conduct a profitable business. He was incapacitated from further work. The fire had destroyed the business of the company as a going business, and it could not continue without a reconstruction of its plant and a reorganization of its business. It seems to me that it had nothing to do but to discontinue business. It is true that the directors could have applied to have the corporation dissolved, have a receiver appointed, and it may be sell

the good will of the business conducted by the corporation with its other assets which did not consist of money; but these directors represented a very small portion of the capital stock of the corporation, and, if the plaintiff had wished to accomplish such a result, she could have commenced at once the proper action for that purpose; but there is nothing in the record, as I view it, to show that the Crandall-Pettee Company actually acquired the good will of the Crandall & Godley Company. It did not purport to have acquired such good will, and while it seems to have appropriated or used certain of the trade-marks of the company, and for a short time property that had been saved from destruction by the fire, the good will of the business as a going business was never, as I read this testimony, actually appropriated by the Crandall & Godley Company, and I think it entirely unjust to charge the directors of the Crandall & Godley Company, or the Crandall-Pettee Company and its organizers, with the value of the good will of the Crandall & Godley Company as a going concern.

I therefore dissent from the determination to affirm so much of the judgment as in this action imposes upon any of the defendants a liability for what the court finds was the value of the good will of the Crandall & Godley Company.

McLAUGHLIN, J., concurs.

SCOTT, J. I concur entirely with Mr. Justice CLARKE so far as he goes; but in my opinion we should go further, and hold the defendants who were directors of the Crandall & Godley Company liable to the company, not only for the moneys fraudulently paid out to themselves under the guise of increased or additional salaries, but also for the moneys paid out in like manner and under the same guise to those favored stockholders who were employés, though not directors, of the corporation.

The basis upon which the directors are held liable at all is that they unlawfully diverted the money of the corporation to themselves and other favored stockholders, ostensibly as salaries or compensation for services, but really with a view to dividing up the surplus among themselves and those whom they favored, thus undertaking to "freeze out" the stockholders with whom they were not friendly. In effect they are found guilty of having paid the moneys of the corporation to themselves and others without consideration or equivalent flowing to the corporation. This was an unlawful diversion of the funds of the corporation, and a fraud upon the minority stockholders. The reason why the directors are required to pay back what they illegally received under this scheme is that they were actors in it, and in so acting violated their fiduciary relation to the corporation and its stockholders. I think that they are liable for all that was thus illegally paid out as a result of their wrongful acts. In Latimer v. Veader, 20 App. Div. 418, 46 N. Y. Supp. 823, an officer of a bank who had embezzled its funds was held liable, not only for what he had stolen himself, but for all that had been stolen by his subordinates through his connivance or negligence. The same rule I think is applicable to the present case.

I am therefore of the opinion that the judgment should be affirmed, without modification.

While entertaining the views above expressed, I am not disposed to insist upon them, if by so doing the disposition of the appeal will be delayed. The case is an important one, involving a large amount of money, and will, I assume, be taken to the Court of Appeals. If so, we should not unnecessarily delay its progress. The case was carefully tried, and it is wholly improbable that any new facts would be developed upon a new trial. The appeal was fully and ably argued, and it is not probable that a reargument would throw any further light upon the questions as to which the members of this court are divided in opinion. I am therefore prepared, in order that the case may be disposed of, so far as this court is concerned, to concur in the opinion of my Brother CLARKE, merely expressing my own opinion as above stated.

LAUGHLIN, J. I concur in the views expressed by Mr. Justice CLARKE, excepting on one point. I am of opinion that the directors were guilty of a breach of their trust in authorizing the disbursement of moneys of the corporation in the form of salaries or bonuses to employés, based solely upon the stock ownership of such employés, by which, in effect, dividends were given to such stockholders in the form of salaries, for the purpose of depriving the plaintiff from participating in dividends. It was shown by the evidence, and found by the trial court, that such payments, in so far as they purported to be increases of salary or bonuses, were not based upon services rendered.

The principle upon which directors are accountable to the stockholders of a corporation is that they owe to them a trust duty to exercise reasonable care in the management of the property and affairs of the corporation; and on that theory they are, I think, equally accountable for moneys which they negligently, and without consideration to the corporation, allow to be disbursed *to employés,* as for funds which they appropriate to themselves. Mutual Life Ins. Co. v. McCurdy, 118 App. Div. 815, 103 N. Y. Supp. 829; Id., 118 App. Div. 827, 103 N. Y. Supp. 837; Id., 118 App. Div. 822, 103 N. Y. Supp. 840; People v. Equitable Life Assurance Society, 124 App. Div. 714, 109 N. Y. Supp. 453.

The judgment, however, instead of requiring the directors to account for the *increase* of salaries, payment of which they thus authorized, requires them to account for the *entire amount* of the salaries thereafter paid. This, I agree with my Associates, was erroneous, because, but for such action, the salaries would have continued as previously lawfully fixed.

I therefore vote to modify the judgment by confining the accounting concerning salaries received by the directors, or paid out pursuant to the resolution of November 14, 1906, to the *increase* of salaries received or paid out under said resolution, and for its affirmance as so modified.