WEST et al. v. CARLISLE. (No. 7466.)

(Court of Civil Appeals of Texas. Galveston. Dec. 3, 1917. On Motions for Rehearing, Dec. 20, 1917.)

1. RAILROADS ⬥15 — SALE OF STOCK — LIABILITY OF SELLER FOR TAXES AND UNSETTLED CLAIMS.

Where the owner of all the stock and bonds of a railway and practically of all its property proposed to sell all of the stock and bonds and to deliver to the purchasers the control of the railway October 1, 1912, free from all debts and incumbrances of every nature, except that of the mortgage given to secure the bonds sold, regardless as to whether such debts and incumbrances were ordinarily known as bills payable, it not being the purpose of the transaction to convey cash in bank or in the hands of the railway or anything other than the stock, bonds, and general control of the railway, the seller was chargeable with all taxes for 1912, and with the sum paid out by the buyer in settlement pending suits against the railway and other unsettled claims or demands against it.

2. EVIDENCE ⬥455—CONTRACTS—INTENTION OF PARTIES—USE OF PARTICULAR WORDS.

The intention of the parties in using certain words in a contract controls all ordinary definitions, and, if the intention can be derived from the document as a whole, no evidence of the ordinary meaning of such words, dehors the instrument, is admissible.

3. RAILROADS ⬥152 — SALE OF BONDS — INCLUSION OF INTEREST COUPONS IN EXCEPTION OF CONTRACT.

Interest coupons attached to the bonds of a railway sold by the owner of all its stock and bonds and practically all its properties were not included in the exception to the contract of sale providing that the owner contracted to have the railway should be delivered to the purchasers clear of debts or incumbrances, "except the first mortgage above referred to," which was to secure the bonds taken in payment.

4. APPEAL AND ERROR ⬥1027 — HARMLESS ERROR.

If a holding to such effect was erroneous, it was harmless to the purchasers, who, in their suit against the seller, were credited with the coupon interest.

On Motions for Rehearing.

5. APPEAL AND ERROR ⬥852—REVIEW—THEORY OF CASE BELOW.

Where, in all the proceedings in suit by purchasers of railway securities against the seller, up to the time of filing of the purchasers' motion for rehearing, certain money in banks was treated as collections from the operation of the railway, and not as the proceeds of the sale of property, the Court of Civil Appeals will decline to consider it in any other light than that in which it has been treated.

Appeal from District Court, Harris County; Henry J. Dannebaum, Judge.

Suit by J. M. West and R. C. Duff against William Carlisle, who brought a cross-action. From judgment for defendant on his cross-action, plaintiffs appeal. Judgment reformed and affirmed.

Baker, Botts, Parker & Garwood, of Houston, for appellants. Wilson, Dabney & King, of Houston, and E. A. Haid, of St. Louis, for appellee.

LANE, J. This suit was instituted by J. M. West and R. C. Duff against William Carlisle for an alleged breach of the terms of a contract which they (West and Duff) had entered into with him for the purchase of certain securities which gave the control and practically the ownership of a line of railway, known as the Beaumont & Great Northern Railway. There was a cross-action by Carlisle, the parties disagreeing as to the meaning and construction of the fourth section of the contract. The cause was tried before the court without a jury, and judgment was rendered for Carlisle on his cross-action, and from such judgment West and Duff have appealed.

The following statement is sufficient for the purpose of fairly presenting the issues involved in the litigation:

The Beaumont & Great Northern Railway was a line of railway located principally in Polk and Trinity counties, and incorporated under the statutes of this state. In 1912 the railroad had issued and outstanding 340 shares of capital stock of the par value of $34,000; it also had issued and outstanding 605 5 per cent. bonds, par value $605,000. William Carlisle was the owner of all of the stock and all of the bonds of said railroad, and through this ownership controlled and operated the railroad and dominated the railroad corporation. On May 20, 1912, Carlisle entered into a contract with J. M. West and R. C. Duff for the sale to West and Duff of these stocks and bonds. The obvious purpose of the transaction was to transfer to West and Duff the control of said railroad property, with its rights, privileges, and appurtenances, etc., in so far as Carlisle could do so. This contract is lengthy, but the following are the salient features:

(a) The contract recites that Carlisle is the owner of the stock and bonds of said railroad company, which stock and bonds are denominated "railroad securities," and he agrees to sell these "railroad securities" to West and Duff for $778,000. If the sale is not consummated until after June 1, 1912, then there shall be added to the purchase

price a sum equal to 6 per cent. per annum from June 1, 1912.

(b) They have the right to tender Carlisle this agreed price $778,000, with interest as aforesaid, and to acquire all of the "railroad securities" (except 100 shares of stock) at any time before noon, August 20, 1912.

(c) As an alternative, Carlisle agrees to accept as part of the purchase price the guaranty of a solvent railway company of the principal and interest on his 605 bonds, and to accept (or retain) these 605 bonds guaranteed by some solvent railway company, in lieu of cash.

(d) Article IV of this contract of May 20, 1912, is the one out of which this litigation grows, and is as follows:

"Owner contracts and agrees that effective as of date on which the railroad securities are to be paid and delivered to the purchasers, or their assigns, the railroad shall be delivered to them clear of debt or any incumbrance, except the first mortgage above referred to, which is to say that the current bills and accounts receivable shall suffice to discharge the bills and accounts payable, and in the event of the failure to do so, the difference shall be made good by the owner, and if there is an excess of cash resulting therefrom, then such excess is to be retained by the owner."

On June 15, 1912, the parties made a further supplemental contract, which stipulated:

"That whereas, the original contract bound Carlisle to accept 605 guaranteed bonds par value in lieu of cash and as a credit upon the agreed purchase price, when guaranteed both as to principal and interest, that he also agrees in this supplement to accept additional bonds to cover the entire purchase price at par, plus the aggregate amount of interest accrued on such bonds up to the time of the consummation of this transaction."

By a further supplement, dated the 21st day of September, 1912, Carlisle agreed to accept $778,000 for all of the stock and all of the bonds, with interest at 6 per cent. from June 1, 1912, the same to be paid in first mortgage gold bonds, of the Beaumont & Great Northern Railway Company, guaranteed by the Missouri, Kansas & Texas Railway Company; bonds to carry coupons beginning with the coupon maturing January 1, 1913, and to be accepted on the purchase price at par, plus portion of coupon matured to date of settlement. In addition to the bonds sold by Carlisle to West and Duff for the sum of $778,000, Carlisle also sold to them the 100 shares of the stock retained by him in said contract between the parties for the sum of $5,000, which sum added to the $778,000 first mentioned, aggregated the sum of $783,000, which West and Duff agreed to pay Carlisle for all the bonds and all the stock of said railway company.

West and Duff contend: First, that the stipulation in article IV of the original contract by which it was agreed "that the railroad should be delivered to them clear of debt or any incumbrance, except the first mortgage above referred to," did not include

within the exception the interest coupons that had accrued on the first mortgage bonds of September 30, 1912, the day that the deal was consummated and the property turned over; that these coupons constituted a debt and incumbrance on the property not included within the exception "except said first mortgage above referred to." The coupons accrued on that date aggregated $7,562.50. These coupons were not due and payable until January 1st following. The trial court disallowed this item, sustaining exceptions to the plaintiff's petition wherein this claim was asserted. Second. They contend that suits for damages for personal injuries and other unliquidated demands, which suits were pending at the time the properties were turned over, and other claims against the railway company upon which no suit had at that time been brought, were incumbrances within the meaning of the contract, and they seek to take credit in the final accounting for attorney's fees, court costs, and amounts paid in settlement of these suits and claims. The amounts involved under this claim aggregated $783.38. Carlisle disputes this contention. The trial court disallowed this item. Third. They contend that all taxes for the year 1912 upon the property were incumbrances within the meaning of the contract, and that they should have credit for the full amount of these taxes, they having paid them. Carlisle disputes the contention. The total of these taxes is $3,648.29. The trial court allowed West and Duff $2,736.22 on account of these taxes, upon the theory that three-fourths of the year's taxes had accrued when the sale was consummated, September 30, 1912, but declined to allow them a credit for the full amount of the year's taxes, a difference of $912.07.

At the time the sale of the stock and bonds was made, and the property was turned over to West and Duff, on September 30, 1912, the Beaumont & Great Northern Railway Company had on hand, deposited to its credit in banks, $7,868.29 in cash collected upon accounts payable, and it had in the possession of its agents and in transit $598.52, of all of which West and Duff took possession and now hold. Carlisle contends that this money was a bill receivable or account receivable within the meaning of clause IV in the contract, and that he is entitled to a judgment against West and Duff for this money, and he seeks to recover it in a cross-action. West and Duff dispute the contention and contend that such funds belong to the railway company. The trial court gave Carlisle judgment therefor. West and Duff further contend that this money was neither an account nor bill receivable within the meaning of the contract, and that in no event is Carlisle entitled to a judgment against them for this money.

It is alleged by plaintiffs West and Duff that a settlement was made between them

and Carlisle as to purchase price of said bonds and stock purchased by them from Carlisle on the 11th day of October, 1912, as follows:

Purchase price of as date of June 1, 1912.. $778,000 00
100 shares of stock, par $10,000.00 (see
    agreement just above)..............     5,000 00

    Total ..................................  $783,000 00
Interest from June 1, 1912, to date of
    settlement (Oct. 12, 1912)...........  $ 17,118 43

    Grand total ...........................  $800,118 43
Settled as follows: 605 bonds
B. & G. N. Ry. guaranteed
by the M., K. & T. Ry., par
$1000 each ..................... $605,000 00
Interest at 5 per cent. from
    July 1, 1912...................     8,538 70    613,538 70

                                $186,579 73
Balance due and unpaid on Oct. 12, 1912..  $186,578 73
Less error .....................................     22 93

                                $186,555 80

It was also alleged that said bonds and stock were delivered and credited. It is admitted by all parties that the balance due Carlisle of $186,555.80, shown in the above tabulated statement, was paid in the bonds of the Beaumont & Great Northern Railway Company subsequently issued with the consent of the state Railroad Commission, and guaranteed by the Missouri, Kansas & Texas Railway system as per the contract between the parties.

From what has been said it is apparent that on the 30th day of September, 1912, at which time all of said bonds and stock were delivered to West and Duff, the absolute control of said railroad was also turned over to them, and at that time all parties had fully performed the terms of the contract, except such obligations as arose from the provisions of section IV thereof. There are no issues of fact presented by the record.

The court sustained Carlisle's special demurrer to so much of the plaintiffs' petition as sought to charge Carlisle with the accrued interest on the 605 bonds sold by him to plaintiffs; to so much of the same as sought to charge him with sums of money paid out by plaintiffs for damages involved in suits or claims pending against the Beaumont & Great Northern Railway at the time said railway was turned over to plaintiffs, on September 30, 1912, and refused to hear evidence offered by plaintiffs in support of their allegations with reference to such matters, and found: (1) That by the terms of the fourth section of the contract West and Duff assumed the payment of the mortgage mentioned in said section, together with interest due thereon, and therefore could not recover from Carlisle the interest on the bonds; (2) that the contract did not bind Carlisle to pay costs and expenses amounting to $783.38 in settling suits and claims pending against the railway company at the time the railway was turned over to West and Duff; (3) that under the provisions of section IV of the contract Carlisle was entitled to the $7,868.29 cash in bank to the credit of the Beaumont & Great Northern Railway Company, and to $598.52 cash in the hands of the agents of said company, aggregating $8,466.81; (4) that the contract did bind Carlisle to pay three-fourths of the taxes for the year 1912, amounting to $3,648.29.

From the undisputed and agreed facts the following facts are shown: (1) That the date of the turnover and settlement between West and Duff on the one part, and Carlisle on the other part, was October 1, 1912, but that the business was closed on September 30, 1912. (2) That the bonds were turned over by West and Duff to Carlisle in compliance with the contract and the purchase thereby completed subject to the adjustment of the accounts between the parties herein, mentioned in section IV of the contract. (3) That on September 20, 1912, the accrued interest on the bonded debt of the railroad company amounted to $7,562.50. (4) That the taxes on this property for the year 1912 were $3,648.29, and that if these taxes were apportioned and treated as having accrued in proportion to the parts of the year expired and unexpired, that there would have accrued on the 30th day of September, 1912, $2,736.22. (5) That the bills and accounts payable at the end of the business, September 30, 1912, not including taxes or bond interest, and excluding attorney's fees, court costs, and other expense in connection with and arising out of lawsuits then pending, and lawsuits subsequently filed, growing out of transactions pending on that date, aggregated $18,517.17. (6) That the bills and accounts receivable at the end of the business, September 30, 1912, not including money in transit or cash in bank, aggregated $18,195.82. (7) That West and Duff had paid out the sum of $783.38 in defending and settling suits and claims against the railway company, which sum included attorney's fees, court costs, and other necessary expenses. (8) That Carlisle is indebted to West and Duff $250 on account of expenses incurred in connection with the issuance of certain bonds. (9) That at the close of business on September 30, 1912, there was in bank to the credit of the Beaumont & Great Northern Railway Company cash $7,868.29, and in the hands of agents and in transit on the same date, $598.52; the total amount of this cash being $8,466.81.

Upon the conclusion of the court's findings above stated and the undisputed and agreed facts, the court rendered judgment in favor of Carlisle for the sum of 5,159.24, with 6 per cent. interest per annum thereon from the 31st day of December, 1914, to December 9th, the date of the judgment, aggregating a total sum of $5,759. The sum of $5,159.24 for which judgment was rendered for Carlisle was arrived at by the trial court in the following manner: West and Duff were charged with $18,195.82 for collections made by them upon what was called in the contract "bills and accounts receivable" belonging to the

railway company, with the sum of $7,868.29 cash in bank, and $598.52 cash in the hands of agents of the railway company, both of which sums had been taken possession of by West and Duff, all aggregating the sum of $26,662.63. Carlisle was charged with the following sums: $17.517.17 due by the railway company, called in the contract "bills payable," with $2,736.22, same being three-fourths of the taxes due on the property sold by him for the year 1912, and with the sum of $250, the amount which Carlisle agreed to pay upon expenses incurred in connection with the issuance of a certain bond issue, all aggregating $21,503.39, and by then subtracting the aggregate of the sums charged to West and Duff; the difference between the two said aggregate sums being $5,159.24.

[1] We think the trial court erred in not charging Carlisle with the other one-fourth of the taxes for 1912, amounting to $912.07, and in not also charging him with $783.38, a sum paid out by West and Duff in settlement of pending suits, and other unsettled claims or demands against the railway company; both sums aggregating $1,695.45. Had these two sums been charged to Carlisle, and deducted from the sums charged to West and Duff, it would have left a balance due by them to Carlisle on the 31st day of December, 1914, of $3,463.79, instead of $5,159.24, as adjudged by the trial court. Therefore the amount of the judgment which should have been rendered in favor of Carlisle against West and Duff is $3,463.79, with 6 per cent. interest per annum thereon from the 31st day of December, 1914, to December 9, 1916, the date of the judgment, or a total sum at that date of $3,867.90 instead of $5,759, the amount of the judgment rendered by the trial court.

[2] Counsel for both parties, in their very able briefs, have at great length discussed the meaning of the words "debts," "incumbrances," "bills and accounts receivable," and "bills and accounts payable." We shall not undertake to follow counsel in such discussion, but have endeavored to apply the rules of common sense and the law of simplification in an effort to determine the sense in which those words are used, and were understood by the parties to be used in the contract at the time they were inserted therein. The intention of the parties controls all ordinary definitions, and if the intentions of the parties in the use of such words can be derived from the document as a whole, no evidence as to the ordinary meaning of such words, dehors the instrument, is admissible. A safe and accurate interpretation of words used in a contract may, be had by viewing the subject of contract as the mass of mankind would view it.

In Burress v. Blair, 61 Mo. 133, 140, 141, it is said:

"It must be recollected that the meaning to be attached to words very frequently depends on the connection in which they are used. * * *

The object to be attained in construing a contract is to get at the intention of the parties. To do this, it will not do in all cases to take one or two words and construe them according to their popular meaning, without any regard to the connection in which they stand. Words are to be construed according to their strict and primary acceptation, unless, from the context of the instrument and the intent of the parties to be collected from it, they appear to be used in a different sense, or unless in their strict sense they are incapable of being carried into effect. * * * In reference to the contract under consideration, we think, when taken as a whole, that it presents no latent ambiguity in its construction, or in its application to the subject-matter, which would justify the introduction of parol evidence. * * * It would be hard to resist the conclusion that the intention of the parties by this language was to give the most extended meaning to the words 'accounts of the firm,' and thereby include the account of the firm with the bank."

In Latimer v. Veader, 20 App. Div. 418, 46 N. Y. Supp. 823, the court says:

"It is not necessary to multiply citations to show that, where one of two meanings can be given to a word used in an instrument of this character, the court should consider the object for which the instrument was executed, to ascertain which of the two meanings the parties intended to use; and, looking at this case, it is apparent that it was the intention of all the parties that this mortgage should be given to secure all liabilities of Buxton arising out of his connection with the defalcation of this sum, and it was not intended to restrict it to the amount to which he could be said to be indebted to the bank upon a contract, or for money which he himself appropriated and used."

It is unnecessary for us to cite other authorities to make clear our views as above expressed.

From the contract as a whole and the undisputed evidence it is made clear to us that Carlisle, the owner of all the stock and bonds, and practically of all the properties of the Beaumont & Great Northern Railway Company, proposed to sell all of said stock and bonds to West and Duff and deliver to them the control of the railroad on the 1st day of October, 1912, free from all debts and incumbrances of every nature whatsoever, except that evidenced by the mortgage given to secure the bonds sold by Carlisle to West and Duff, regardless as to whether such debts and incumbrances were ordinarily and commonly known as "bills payable" or not, for the sum of $783,000; that it was not the purpose of Carlisle to sell, nor of West and Duff to buy, cash in bank or in the hands of agents of the railway company, or anything other than the stock, bonds, and general control of the Beaumont & Great Northern Railway. We think it further clearly appears from the contract between the parties, as a whole, that it was understood and agreed between them that all obligations due to the railway company, and such earnings of the same as might accumulate prior to the date the said stock and bonds were to be delivered to West and Duff, were to be used in paying off and discharging all debts

and incumbrances then existing against said railroad.

[3, 4] The complaint by appellants of the action of the trial court in holding that the interest coupons attached to the bonds sold by Carlisle to them was included in the exception in section IV of the contract is without merit. We think the holding of the trial court is correct; but if such holding was error, it would not injuriously affect the rights of appellants, as it is very clearly shown by the allegations in appellants' petition that they were credited with this coupon interest.

Having reached the conclusion as hereinbefore expressed, the judgment of the trial court in favor of William Carlisle for the sum of $5,159.24 is here reformed by deducting from such sum $1,695.45, the same being the aggregate sum of $912.07, the one-fourth of the taxes charged by the court to West and Duff, and the $783.38 paid out by West and Duff in settlement of suits and other unsettled claims against the Beaumont & Great Northern Railway Company, leaving a balance of $3,463.79, with 6 per cent. interest per annum thereon from December 31, 1914, to December 9, 1916, for which judgment is here rendered in favor of William Carlisle against J. M. West and R. C. Duff jointly and severally. What has been said sufficiently disposes of all of appellants' assignments.

The judgment as here reformed is affirmed.

Reformed and affirmed.

## On Motions for Rehearing.

In our original opinion we said:

"At the time the sale of the stock and bonds was made, and the property was turned over to West and Duff, on September 30, 1912, the Beaumont & Great Northern Railway Company had on hand, deposited to its credit in banks, $7,868.29 in cash *collected upon accounts payable.*"

West and Duff have filed their motion for rehearing, and complain of so much of the above statement as states that the cash in banks was "collected upon accounts payable." If it was their intention to complain of the use of the words "accounts payable" being used instead of the proper words "accounts receivable," their complaint is justified, and we here make the change suggested, as the word "payable" was inadvertently used for the word "receivable"; but if the complaint is, as it seems to be, that we erred in finding that the cash in banks was collected upon accounts, as were intended to be included in the words "accounts receivable," we overrule the complaint.

[5] There is no merit in the contention of appellant that the money in banks may have been received from the sale of equipment, or from the sale of securities, made for the first time in his motion for rehearing filed in this

court. In all the proceedings, so far as we are able to discover from the record, or the briefs of the parties to the suit, up to the time of filing appellant's motion for rehearing, the money in banks was treated as collections from the operation of the railroad and not as the proceeds of the sale of property, and we at this late day decline to consider it in any other light than that in which it has been treated throughout the entire proceedings.

Complaint is also made of what purports to be a copy of a paragraph of the original opinion, as follows:

"We think it further clearly appears from the contract between the parties as a whole that it was understood and agreed between them that all surplus due to the railroad company and such earnings of the same as might accumulate prior to the date the said stock and bonds were delivered to West and Duff were to be used in paying off and discharging all debts and incumbrances then existing against the railroad."

The word "surplus" found in the purported copy is not to be found in the original. This word as inserted in the purported copy is substituted for the word "obligations" in the original.

Appellee has also filed his motion for rehearing, which we have examined, and which we have refused because we think it without merit. We see no reason to make any change in our original opinion except as above indicated. Both motions are refused.

---

⬤══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes