BELL et al. v. KIRBY PETROLEUM CO.*
(No. 8584.)

(Court of Civil Appeals of Texas. Galveston. Jan. 28, 1925. Rehearing Denied March 5, 1925.)

1. Contracts ⬤⟻147(1)—Intention of parties controls ordinary definitions.

The intention of the parties controls all ordinary definitions.

2. Evidence ⬤⟻455—No evidence as to ordinary meaning of word, dehors contract, is admissible, where intention of parties can be derived from contract.

If intention of parties in use of word can be derived from the contract as a whole, no evidence as to ordinary meaning of such word, dehors the contract, is admissible.

3. Contracts ⬤⟻152—Subject of contract viewed as mass of mankind would view it in interpretation of words used.

A safe and accurate interpretation of words used in a contract may be had by viewing the subject of the contract as the mass of mankind would view it.

4. Mines and minerals ⬤⟻74—Assignment of interest in oil lease held to require payment to assignor of certain amount within year, even though no oil was produced.

Contract assigning interest in oil lease, in so far as it covered a certain portion of the land, providing for payment to assignor of certain portion of gross production until certain amount shall have been fully paid, and for payment on expiration of one year from date of assignment of "balance then due," if such amount is not paid within such year, "so as to fully and finally pay" assignor the full sum of such amount within such year, required assignee to pay the full amount within the year, even though no oil was produced.

5. Evidence ⬤⟻450(1)—Contract held subject to construction from language thereof without aid of parol evidence.

Contract, assigning interest in oil lease, in so far as it covered a certain portion of the land, providing for payment to assignor of certain portion of gross production until certain amount shall have been fully paid, and for payment on expiration of one year from date of assignment of "balance then due," if such amount is not paid within such year, "so as to fully and finally pay" assignor the full sum of such amount within such year, could be construed from the language of the contract itself to require assignee to pay full amount within year, though no oil was produced, without aid of parol evidence.

─────────

⬤⟻For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction April 22, 1925.

**6. Mines and minerals ⊚⟶74—Assignment of interest in oil lease will not be set aside on ground of mutual mistake as to productivity of land.**

Contract, assigning interest in oil lease, in so far as it covers a certain portion of the land, and providing for payment to assignor of certain portion of gross production of oil until $80,000 shall have been paid, or for payment of such amount on termination of year from date of assignment, if such amount shall not have been received in full by assignor during the year, will not be set aside on failure of land to produce oil, in so far as it requires the payment of such amount in full, on the ground of mutual mistake as to land being oil producing land; the contract being purely a speculative contract on part of assignee, from which equity will not release it.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by A. H. Bell and others against the Kirby Petroleum Company. Judgment for defendant, and plaintiffs appeal. Reversed and rendered.

Vinson, Elkins, Wood & Sweeton, of Houston, for appellants.

R. H. Ward and Pleasant F. Graves, both of Houston, for appellee.

LANE, J. On the 3d day of June, 1919, Joe Ross and wife, Mary Ross, the owners of 191 acres of land in Limestone county, Tex., executed and delivered to Louis Gutman an oil lease of said land, by the terms of which Gutman was to pay to Ross and wife a certain royalty. In the course of trade and by mesne conveyance A. H. Bell became the legal owner of the lease of Gutman, in so far as it covered a certain 11 acres of said 191-acre tract, which was, in the instrument by which it was conveyed to him, described by metes and bounds.

On the 4th day of November, 1921, A. H. Bell and the Kirby Petroleum Company, by its vice president, T. H. Bass, entered into a written contract in two parts, the portions of which, pertinent to the issues involved in this cause, are as follows:

"Whereas, the Humphreys Mexia Company of Delaware did duly assign to A. H. Bell under date of August 11, 1921, and duly recorded on August 24, 1921, in volume 116, p. 576, of the deed records of Limestone county, Tex., a certain portion of said lease described as follows, to wit: [Here follows a description of the 11-acre tract.]

"Whereas, that part of said lease above described and all rights thereunder or incident thereto are now owned by A. H. Bell:

"Now, therefore, for and in consideration of $1 and other valuable consideration, and subject to the other valuable considerations, the receipt of which is hereby acknowledged, the undersigned, the present owner of that portion of said lease above described, and all rights thereunder or incident thereto, does hereby bargain, sell, transfer, assign, and con-vey all rights, title, and interest of the original lessee, and the present owner in and to said lease and rights thereunder, in so far as it covers the following described property: [Here said 11 acres are again described.]

"First. That the said Kirby Petroleum Company agrees to pay unto A. H. Bell, his heirs, successors, or assigns five-eighths of the total gross production of all oil, gas, water, or other minerals produced from the above-described premises until the full sum of $80,000, without interest, has been fully paid. In calculating the gross production no royalty shall be deducted.

"Second. That, in case marketing conditions prevent the sale of said products as the same are produced from said well or wells drilled on said premises, so that the same cannot be promptly marketed, then and in that event the said Kirby Petroleum Company agrees to store all that part or portion of said products belonging to the said A. H. Bell until the same can be marketed free of cost to said Bell, and as the same are placed in storage to execute to said Bell a bill of sale or such other legal instrument as may be necessary to vest in said Bell the title in and to said products so stored.

"Third. That, in case said $80,000 is not paid to said Bell within one year from the date of this assignment, then and in that event the said Kirby Petroleum Company agrees to pay on said date in cash the balance then due, so as to fully and finally pay said Bell the full sum of $80,000 within one year from the date of this instrument.

"Fourth. That the said Kirby Petroleum Company agrees to develop said property with due diligence, to protect and drill all offset wells, and do everything that may be necessary or which may be required to fully protect said original lease and the interest of said Bell therein.

"Fifth. That the said A. H. Bell hereby reserves a vendor's lien upon said premises and all appurtenances thereunto belonging, including all property annexed or affixed to said estate by the said Kirby Petroleum Company, subsequent to the date of this assignment, for his full protection and the payment of the consideration and purchase money for the assignment of this lease, namely, the full sum of $80,000, as provided by the laws of the state of Texas.

"Sixth. That, in order to fully guarantee the said A. H. Bell in the payment of said $80,000, there is hereby executed contemporaneously with this assignment a written guaranty by the said Kirby Petroleum Company, which is made a part and parcel of this assignment, and is hereby referred to for all purposes.

"And for the same consideration as herein explained to be paid, the undersigned, for himself and his heirs, successors, and representatives, does covenant with the said assignee, its heirs, successors, or assigns that he is the lawful owner of that portion of said lease and rights and interests thereunder, and of the personal property thereon or used in connection therewith; that the undersigned, A. H. Bell, has good right and authority to sell and convey the same; and that said rights, interests, and property are free and clear from all liens and incumbrances, and that all rentals and royalties due and payable thereunder have been duly paid, and that the undersigned will

⊚⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

warrant and defend the same against the lawful claims and demands of all persons whomsoever.

"In witness whereof the undersigned owner and assignor has signed and sealed this instrument this 4th day of November, A. D. 1921.

"A. H. Bell."

The written guaranty (called for by the sixth paragraph of above instrument) is as follows:

"Know all men by these presents that the undersigned, the Kirby Petroleum Company, a Delaware corporation, for and in consideration of the assignment of a certain 11-acre tract out of the P. Varela XI League Grant, in the county of Limestone, and state of Texas, more specifically described in said assignment, does hereby covenant and agree with said A. H. Bell, his heirs, successors, or assigns that, in case of the failure of the above-assigned property to produce out of five-eighths of the gross production from said premises the total sum of $80,000, to be paid to the said A. H. Bell, out of the above-described portion of said production, it will promptly pay to the said A. H. Bell the difference between what has been paid Bell under said assignment and $80,000 within one year from date hereof, so that the said Bell will receive by virtue of said assignment and the consideration thereof the full sum of $80,000, and the said Kirby Petroleum Company hereby covenants and agrees to fulfill in each and every particular this obligation.

"In witness whereof said Kirby Petroleum Company has hereunto affixed its name, by its proper officer, attested by its secretary with seal attached, dated at Mexia, Tex., this 4th day of November, 1921.

"Kirby Petroleum Company,
"By T. H. Bass, V. P.
"Attest: Jno. H. Baird,
"[Seal.] Acting Secretary."

Kirby Petroleum Company immediately took possession of said land and lease and began the drilling of three wells thereon. It sank one well to the depth of 3,065 feet, which was below the depth where oil should have been found in that particular field, and found no oil. It also sank two other wells to the depth of 2,800 to 2,900 feet, but did not complete either of them because the first one had not produced oil and the officers and agents of said company concluded no oil could be found on said land.

After the lapse of one year from the date of the contract between the parties, Bell and his associates demanded of the Kirby Petroleum Company the payment of the $80,000 named as a consideration in said contract. The petroleum company refused payment of any sum, contending that its contract was to pay the consideration or any part thereof only in the event it produced oil from said land, and further that it owed lessors nothing, in that the contract was entered into by both parties under the mutual belief that the land was proven oil land, and would produce oil in paying quantities, while as a fact it was not oil-producing oil land. Upon such refusal to pay said consideration, Bell, the legal owner and holder of the lease on said land, joined by Lora Bell, Frances Beeler, and I. B. Humphreys, owners of an equitable interest therein, brought suit upon the contract, against the Kirby Petroleum Company, to recover the sum of $80,000, the sum named in said contract as the consideration to be paid by the petroleum company for said lease. The petroleum company defended upon the grounds:

First. That, by the terms of the contract sued upon, it was only obligated to deliver to the plaintiffs five-eighths of the gross production of the oil from the land within one year from the date of the contract until the value of said five-eighths of said production amounted to $80,000, provided a sufficient amount of oil was taken from the land to pay said sum by a delivery of five-eighths thereof to plaintiffs; that it is not provided by the terms of the contract that the company is to pay plaintiffs any sum whatever, unless some oil is produced from the land, and that it is provided and stipulated in the contract that, if some oil is produced and delivered by the company to the plaintiffs, and only in that event is the company obligated to pay the plaintiffs any sum, and that in such event it is obligated to pay only the difference between the value of the oil delivered and the $80,000 mentioned in the contract; that no oil was produced from said land, and therefore the company owed plaintiffs nothing.

Second. That the leased land is in what is known as the Mexia oil field, in Texas, and that, at the time of the execution of the contract, said land was surrounded by wells which were producing many thousand barrels of oil daily; that such producing wells were situated only a short distance from said leased land; that, because of the facts last stated, all parties to the contract believed that said land was proven oil land and that it would produce oil within one year, if properly exploited, five-eighths of which would be of the value of more than $80,000; that such belief was unfounded as, after the company had drilled its wells, it was demonstrated that said land was not oil-producing land, therefore the contract was entered into by the parties under a mutual mistake of fact, and is not enforceable against said company, in so far as it obligates it to pay plaintiff the full sum of $80,000 for said lease.

A jury was selected to try the cause and, notwithstanding the fact that the parties to the suit were all insisting that the contract was unambiguous, the court heard much testimony from both sides as to the intentions of the parties in entering into the same, but, after all evidence had been closed, the court withdrew the case from the jury and rendered judgment for the defendant Kirby

Petroleum Company. From such judgment the plaintiffs have appealed.

Appellants present two propositions: First, that the assignment of the lease, taken together with the guarantee, which two instruments constitute the contract between them and the Kirby Petroleum Company, is unambiguous and clearly evidences the intention of the contracting parties that the petroleum company should pay to the plaintiffs the full sum of $80,000 for the lease, regardless of whether or not oil, gas, or other minerals were produced therefrom, and, since it was shown that no oil, gas, or other minerals were produced, and that the petroleum company had refused, and was still refusing to pay the purchase price for said lease, the court erred in refusing to render judgment in their favor against the petroleum company for $80,000, the sum named in the assignment and guaranty as the purchase price for said lease, and in rendering judgment for said petroleum company; and second, that, if said assignment and guaranty do not with certainty evidence the intention of the contracting parties, then such intention, because of the conflict in the testimony of the several witnesses on that question, became a question for the determination of the jury, and the court erred in taking the case from the jury, and in instructing a verdict for the petroleum company.

[1-5] We feel constrained to sustain both of appellants' propositions. The contract clearly expresses the agreements of the parties. There is no ambiguity which would require outside evidence to explain it. It clearly evidences that the petroleum company agreed thereby to pay to the plaintiffs the full sum of $80,000 within one year from its date; that it would pay on said $80,000 five-eighths of the oil produced from its wells drilled on said land; and that, if said five-eighths of said oil was insufficient to pay said $80,000, it would pay whatever of the $80,000, remained unpaid at the end of said one year, whether such remainder be the whole sum or only a part thereof. Counsel for appellee in their able brief have at great length discussed the technical meaning of the word "balance" as used in the contract. We shall not, however, undertake to follow counsel in such discussion, but shall apply the rule of common sense and the law of simplification in an effort to determine the sense in which the word "balance" was used in the contract, in the present case, and how it was understood by the parties thereto at the time of the execution of the same. The intention of the parties controls all ordinary definitions, and, if the intention of the parties in the use of the word "balance" can be derived from the contract as a whole, no evidence as to the ordinary meaning of such word, dehors the contract, is admissible. A safe and accurate interpretation of words used in a contract may be had by viewing

the subject of the contract as the mass of mankind would view it. West v. Carlisle (Tex. Civ. App.) 199 S. W. 515; Id., 111 Tex. 529, 241 S. W. 471; Burress v. Blair, 61 Mo. 133-140, 141; Latimer v. Veader, 20 App. Div. 418, 46 N. Y. S. 823. In reference to the contract under consideration, we think, when taken as a whole, that it presents no latent ambiguity in its construction, or in its application to the subject-matter, which would justify the introduction of parol evidence. It would, we think, be hard to resist the conclusion that the intention of the parties, by the language used, was to give the most extended meaning to the word "balance" and not to confine its meaning to the technical definition insisted upon by counsel for appellee.

In the cases cited it is said:

Burress v. Blair:

"It must be recollected that the meaning to be attached to words very frequently depends on the connection in which they are used. * * * The object to be attained in construing a contract is to get at the intention of the parties. To do this it will not do in all cases to take one or two words and construe them according to their popular meaning, without any regard to the connection in which they stand. Words are to be construed according to their strict and primary acceptation, unless from the context of the instrument and the intent of the parties to be collected from it they appear to be used in a different sense, or unless in their strict sense they are incapable of being carried into effect."

In Latimer v. Veader, 20 App. Div. 418, 46 N. Y. S. 823:

"It is not necessary to multiply citations to show that, where one of two meanings can be given to a word used in an instrument of this character, the court should consider the object for which the instrument was executed to ascertain which of the two meanings the parties intended to use."

Applying the common sense rule, of which we have spoken, to the contract under consideration as a whole, it is made clear to us that said contract clearly evidences that it was the intention of both parties thereto, to obligate the petroleum company to pay A. H. Bell $80,000, absolutely, for the lease, within one year from the date of the contract, and, in making such payment, to deliver to Bell five-eighths of all oil it might take from the lease, as it was produced, and if the whole or any of said $80,000 remained unpaid at the end of one year to pay such remainder in cash. Indeed it seems to be conceded by counsel for the petroleum company that, if any oil whatever had been produced, even one barrel, and five-eighths of same had been paid to plaintiffs, the company would, by the terms of the contract, be obligated to pay the difference between such payment and $80,000, to plaintiffs in cash, unless the contract could be avoided on the

grounds of mutual mistake pleaded by the company in its answer.

[6] Having reached the conclusion that judgment should be rendered for the plaintiffs for $80,000, the consideration named in the contract, unless the plea of mutual mistake made by the petroleum company should prevail, we now come to consider whether or not such plea can be sustained upon the evidence adduced. Such plea was, in effect, that at the time of the execution of the contract the leased land was thought by both parties to said contract to be proven oil land; that it would by proper operation, produce sufficient oil to pay the $80,000 named as the consideration in the contract, and that both parties laboring under such belief executed the same; that, as a fact, said land was not oil-producing land; that it had been fully tested by the petroleum company, and no oil was found therein or thereunder.

Urging the affirmance of the judgment in its favor, upon its plea of mutual mistake. the Kirby Petroleum Company insists that the language of the contract sued on, as well as the undisputed evidence, showed that, when said contract was executed, all the parties thereto contemplated and assumed that the land, the subject-matter in this suit, was mineral-bearing land, and that the $80,000 mentioned in said contract could and would have been produced out of five-eighths of the gross production of the oil from said land; whereas, it turned out that said land was not mineral-bearing land, but upon the contrary was void of oil or other minerals, in which event there was a mistake as to the material part of the subject-matter of the contract, and hence there was no binding contract executed because of the want of mutual assent necessary to create a contract, and by reason thereof the contract did not create an obligation upon the part of appellee to pay to appellants the said sum of $80,000 in cash or any part thereof.

Upon the other hand appellants Bell and others are contending that if it be conceded, as it must be, that both parties to the contract at the time the same was executed, believed that the leased land was proven oil-bearing property and would, if properly exploited, produce large quantities of oil, while as a fact it was not oil-producing land, such belief would not, under the facts of the present case, be cause for setting aside the contract upon the grounds of mutual mistake. They contend that the contract was purely a speculative contract and venture on the part of the petroleum company, and that in such case a court of equity will not release such contractor from the performance of his said speculative contract. They insist that it is shown by the contract itself and the undisputed evidence that the land was surrounded by large gushers, and that it might probably produce a million or more barrels of oil worth a million or more dollars and. that, with these possibilities confronting appellee's agent, who made the contract for it, finding Bell and his associates unwilling to take the chance of developing said land, took the apparently safe risk of reaping a large fortune by risking only $80,000; that, if the land had produced a million or more dollars worth of oil, appellants could have demanded no more than $80,000.

We agree with appellants that it is shown by the contract and the undisputed evidence that the contract was purely a speculative contract on the part of the petroleum company, and is one from which it will not be released by a court of equity. Bell and his associates parted with their entire ownership in the lease and were to receive as consideration for the transfer a stipulated sum only. They were not to share in any sum produced from the land over and above $80,000.

In paragraph 855, Pomeroy's Eq. Jurisprudence, vol. 3, the following rule is announced:

"Where parties have knowingly entered into a speculative contract or transaction, one in which they intentionally speculated as to the result, and there is in either case an absence of bad faith, violation of confidence, misrepresentation, concealment, and other inequitable conduct, * * * if the facts upon which such agreement or transaction was founded, or the event of the agreement itself, turn out very different from what was expected or anticipated, this error, miscalculation, or disappointment, although relating to matters of fact, and not of law, is not such mistake within the meaning of the equitable doctrine, as entitled the disappointed party to any relief either by law or canceling the contract and rescinding the transaction, or of defense to a suit brought for its enforcement. In such classes of agreements and transactions, the parties are supposed to calculate the chances, and they certainly assume the risk, where there is no element of bad faith, breach of confidence, misrepresentation, culpable concealment, or other like conduct amounting to actual or constructive fraud."

In the case of Miles v. Stevens, 3 Pa. 21, 45 Am. Dec. 633 (note), it is said:

"In the absence of fraud, concealment, and other inequitable conduct, equity will not relieve from the consequences of voluntary compromises, or speculative contracts, where such transactions turn out differently from what was anticipated. Under such circumstances the parties are presumed to take the chances of a successful outcome to their agreement."

In section 46, page 302 of volume 10 R. C. L., the following rule is announced:

"In the absence of fraud, concealment, and other inequitable conduct, equity will not relieve from the consequences of voluntary compromise, or speculative contracts, where such transactions turn out differently from what was anticipated," citing Colton v. Stanford, 82 Cal. 351, 23 P. 16, 16 Am. St. Rep. 137; McCobb v. Richardson, 24 Me. 82, 41 Am. Dec. 374;

Ashcom v. Smith, 2 Pen. & W. (Pa.) 211, 21 Am. Dec. 437, and other cases.

If the contention of the petroleum company is sound, no sales of oil property, thought by both parties to be oil-producing land, can be safely and absolutely made, for the reason no one knows, in advance of a test, whether or not oil will be produced. If such contention is to be sustained, any oil company, or oil prospector, could purchase leases or land situated in or near great oil fields for a stipulated consideration and then, if after such purchase it was discovered that there was no oil to be found on the land, repudiate such purchase and refuse to pay the stipulated purchase price upon the grounds of mutual mistake. We will not subscribe to any such doctrine, unless we are compelled to do so by superior authority.

Having reached the conclusion that the contract of the parties cannot be set aside upon the grounds of mutual mistake pleaded by appellee, and being of the further opinion that the contract clearly and without ambiguity evidences that the Kirby Petroleum Company agreed to pay A. H. Bell $80,000 for the assignment of the lease, it becomes our duty to reverse the judgment of the trial court, and to here render judgment for appellants for the sum of $80,000, with 6 per cent. interest thereon from November 4, 1922, until paid, and it is so ordered.

Reversed and rendered.

## On Motion for Rehearing.

Appellee, in its motion for rehearing, very vigorously contends that this court erred in holding that the contract entered into between it and Bell was a speculative contract, from which a court of equity will not relieve the parties thereto upon the grounds of mutual mistake. In support of its contention, appellee, Kirby Company, cites Edwards et al. v. T. & B. V. Ry. Co., 54 Tex. Civ. App. 334, 118 S. W. 572, and cases of similar holdings as decisive of the question involved in the present case. We do not think the holdings of these cases are applicable to the facts of the present case.

In the Edwards' Case, Edwards, as part owner of certain land, and as agent for other co-owners thereof, upon which there was a deposit of gravel conveyed to the Trinity & B. V. Ry. Co. all gravel on said land suitable for ballasting its railroad, which said railway company was to remove in 5 years at the rate or 5,000 cubic yards per month, and to pay therefor 1 cent per cubic yard. Both parties believed at the time of entering into the contract that a sufficient quantity of the quality of gravel specified existed on said land, and that the railway company could remove 5,000 cubic yards per month for the term of 5 years, but it was soon discovered that there was only about 6,000 cubic yards of such gravel on the land. Upon such discovery, the railway company informed Edwards that they could not and would not carry out their contract to remove the quantity of gravel mentioned therein. Upon such refusal, Edwards and his associates sued for $2,600, alleged to be the value of the gravel, which could have been removed by the railway company, had it existed, within the 5 years at the rate of 5,000 cubic yards per month. The trial court held that, as there was not the quantity and quality of gravel contracted for, on the land, the railway company was not bound to pay for more gravel than it could take from the land, and, so holding, gave judgment against the railway company for the quantity it could have taken, and by its judgment released said company from the payment of further damages. On appeal this court affirmed the judgment of the trial court. It is clear, we think, that Edwards believed there was on said land the quantity and quality of gravel contracted for, and that he intended to sell the railway company so much gravel of the quality contracted for as the railway company could take from the land in 5 years at the rate of 5,000 cubic yards per month, and that it was the belief of the railway company that such gravel actually existed on the ground; that Edwards and his associates owned the gravel that they were undertaking to sell. In other words, it was the quantity of gravel of a certain quality which Edwards believed he had that he was conveying to the railway company, and which the railway company thought was on the land, and which it contracted to remove and pay for, while as a fact there was not the quantity of gravel sold or bought on the land.

In the present case, Bell sold the petroleum company no certain quantity of oil. He sold the lease only—the right to take all the oil from the land found upon development. Neither party could have pretended to have any certain knowledge at the time of the making of the contract that oil was under the land far below the surface. Bargains of this kind are necessarily speculative in their nature and such as will not be relieved against by a court of equity. In purchasing said lease, petroleum company was not unlike others. Many others made like purchases. No doubt Bell had purchased the same land under circumstances practically the same, as to the state of his knowledge, as were present at the time said company bought from him, such knowledge being equally accessible to both. The contract was entered into in days notorious for speculation in oil leases and oil lands, when but few persons made purchases for development purposes; the object being to sell again at a profit. Such purchases and sales were without number; all understanding from

the beginning that no inconsiderable share of hazard was to be encountered. Mistakes of the kind complained of by the petroleum company were, at the time of the making of the contract, without number. Both Bell and the petroleum company understood from the beginning of the negotiations that no inconsiderable hazard was to be encountered. In the absence of fraud upon the part of Bell, which was neither pleaded nor proven, it could not have been contemplated, no matter how injurious the result of the mistake on the part of the petroleum company might be, that, in case of loss to it, the petroleum company had any grounds of complaint, and, if fortunate enough to mass a fortune from the contract, no matter how large, or to what extent the mistake affected Bell, that a portion of such fortune was to be refunded to Bell.

In the case of McCobb v. Richardson, 24 Me. 82, 41 Am. Dec. 374, the court said:

"The plaintiff, then a young man, and but then recently introduced into business in the profession of the law, was induced to embark in the purchase of timber lands, and to invest between $5,000 and $6,000, constituting the greater portion of his patrimony, in lands of that description, lying remote from his place of residence, in the wilderness part of this state, to which he had never had access, and of which he had no knowledge, relying for their quality upon the certificates of two individuals, of whom he had only heard a favorable report. In so purchasing, however, he was not singular. Many other individuals did the like. His grantor, a man of mature years, had purchased the same land, under circumstances precisely similar, as to the state of his knowledge and for the identical price at which he sold to the plaintiff. It turns out, nevertheless, that the intrinsic value of the land was not, probably, over one-tenth part of the amount paid for it."

Again:

"It is urged here that the timber was the thing contracted for, and that the land was but the incident, the place of deposit merely, the land without the timber being of very little, if of any, value; that both parties at the time supposed it to be covered with a valuable growth of timber, when in fact the timber thereon was from 10 to 20 times less than was supposed. But there is much of fallacy in the position of the plaintiff. There was no fixed and certain item of timber, distinctly and identically in the mind of each party, as intended to be conveyed, as in the case of the dwelling house before instanced. Neither party could have pretended to have any certain knowledge of what was growing upon the land. Neither had ever seen it. The land itself was a specific thing, distinctly in the mind of each party; but of what was growing upon it no precise idea could be entertained. The value of the growth upon a piece of land is always a matter of uncertainty. Estimates concerning it, even by those who have had the best means of forming an opinion, are more or less merely conjectural, and are often void of the truth; and it is familiar knowledge, that nothing is more difficult than to ascertain with precision the quantity and quality of a forest growth, on a large tract of land, in a wilderness country. This the parties must be presumed to have well understood. Neither can be supposed, in such case, to have contracted with the other in the belief that either had any certain knowledge on the subject. Bargains of this description are necessarily made haphazard. Each party speculates, grounding his calculations upon such general information as may be at hand, placing reliance upon his own perspicacity.

"This contract was entered into in days notorious for speculation, when but few if any persons made purchases of timber lands for private use; the object being to sell again at a profit, until which, some operations, by way of getting off timber, might take place. Mistakes of the kind here complained of were without number; all understanding, from the beginning, that no inconsiderable share of hazard was to be encountered. In the absence of fraudulent or erroneous representations, or fraudulent practices on the part of the vendor, it could never have been contemplated, however gross might be the mistake on the part of the vendee, that, in case of loss, he had any ground of complaint, and if fortunate enough to buy ever so advantageously. However, great the mistake of the vendor might have been, no one could have supposed that any portion of his gains was to be refunded."

In Story on Equity, § 150, it is said that—

"Where the fact is equally unknown to both parties; or where each has equal and adequate means of information; or *where the fact is doubtful from its own nature;* in every such case, if the parties have acted with entire good faith, a court of equity will not interpose."

And again in section 151 it is said that—

"Where each party is equally innocent, and there is no concealment of facts, which the other party has a right to know, and no surprise or imposition, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference."

We feel that further discussion of the contentions made by appellee are unnecessary, and, having reached the conclusion that we did not err in the particulars complained of, the motion is overruled.